# Exhibit 4

UNITED STATES DEPARTMENT OF JUSTICE

BUREAU OF ALCOHOL, TOBACCO, FIREARMS
& EXPLOSIVES

HEARING

_____
                                :
IN THE MATTER OF:               :
                                :
PADUCAH SHOOTERS SUPPLY,        :
INC.,                           :
                                :
            Licensee,           :
                                :
      v.                        :
                                :
DEPARTMENT OF JUSTICE,          :
                                :
            Agency.             :
                                :
_____:

                Thursday,
                February 23, 2023

                1600 McCracken Boulevard
                Paducah, Kentucky


        The above-entitled matter came on for
hearing, pursuant to notice, at 10:02 a.m. CST


BEFORE: ADAM P. ROGERS, Director of Industry
Operations, Louisville Field Division

APPEARANCES:

On Behalf of the Licensee:

ROY LYNN McCUTCHEN
CHANCE CLANAHAN
Paducah Shooters Supply, Inc.

On Behalf of the Agency:

MARK LOWNEY, ESQ.
ATF Louisville Field Division

3

CONTENTS

WITNESS                    DIRECT CROSS REDIRECT RECROSS


EXHIBIT NO.                                    MARK RECD

Agency

1-13                                             8      8

FFL

1                                               35

P-R-O-C-E-E-D-I-N-G-S

(10:02 a.m.)

MR. ROGERS:  The time is 10:02 Central Standard Time a.m.  The date is February 23, 2023.  We are located at 1600 McCracken Boulevard, Suite 102, Paducah, Kentucky.  My name is Adam Rogers.  I'm the director, industry operations for the Louisville Field Division and will be the presiding officer over this hearing by the direction and under the authority of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, United States Department of Justice.

The hearing is an administrative hearing that is informal in nature.  It is to review the Notice to Revoke or Suspend and/or Impose a Civil Fine, ATF form 4500(5300.4) issued under the provisions of Title 27, Code of Federal Regulations Part 478, Subpart E.  As a result of the issuance of the ATF Form 4550, the licensee requested in writing that a hearing be granted.  The focus of this hearing will be on the evidence regarding whether the license should be revoked,

suspended, or a fine should be issued.  There are a couple procedural issues I will address before we get started.  The transcript is being made of these proceedings for the record.  Because of this, I ask that we speak one at a time so that a clear and accurate record may be made.  Answers must be audible.  Please do not nod or shake your head in response to a question.  At this time, I'll ask the licensee and those present on its behalf to introduce themselves.  Please give your full name and spell your last name for the record.

MR. MCCUTCHEN:  Roy Lynn McCutchen. M-C-C-U-T-C-H-E-N.  I'm owner of Paducah Shooters Supply.

MR. ROGERS:  Yes, sir.

MR. CLANAHAN:  Chance Clanahan.  C-L-A-N-A-H-A-N.

MR. ROGERS:  Thank you, sir.  Mr. Lowney, will you and anyone get, sorry.  Will you and anyone producing evidence on behalf of ATF introduce yourselves?  Please give your full name

and spell your last name for the record.

MR. LOWNEY:  Yes, Mark Lowney, L-O-W-N-E-Y.  And I'm the Division Counsel for the Louisville Field Division.

MR. DORAN:  I'm Mark Doran, D-O-R-A-N, and I'm the lead industry operations investigator.

MR. ROGERS:  Mark, will you proceed then, please?  Or Mr. Lowney, sorry, since there's two.

MR. LOWNEY:  Okay.  Well, initially, I'll go ahead and just introduce the exhibits into the record, so we can take care of that.  So Exhibit 1 is the Notice to Revoke or Suspend License and/or Impose Civil Fine, dated 12-02 of 2022.  Exhibit 2 is the written request for a hearing from the licensee, dated December 14, 2022.  Exhibit 3 is the written notice of the date, time, and place of today's hearing to the licensee.  Exhibit 4 are a number of ATF forms, 4473 Firearms Transaction Record associated with one of the violations.  Exhibit 5, also a series

of ATF forms, 4473 Firearms Transaction Records associated with one of the cited violations. Exhibit 6, ATF forms, 4473 Firearms Transaction Record associated with violations cited in a notice. Exhibit 7 and 8 are also copies of firearms transaction records that are associated with violations cited in the Notice of Revocation. Exhibit 9 is a Firearms Qualification Report from the application inspection of the licensee. Exhibit 10 are documents associated with a 2015 compliance inspection of the licensee. Exhibit 11 is an Acknowledgment of Federal Firearms Regulations and a Report of Violations from a 2017 inspection of a licensee. Exhibit 12 are firearms -- federal firearms licensee, firearms inventory, theft/loss reports, which were filed by the licensee as a result of the most recent compliance inspection. And Exhibit 13 is a Report of Violations along with Licensee Response to the Violations Report. And the -- those are all the government exhibits, and I'll offer those

8

into the record.

(Whereupon, the above-referred to documents were marked as Government Exhibit Nos. 1-13 for identification and received into evidence.)

MR. ROGERS:  All 12 exhibits are on record.

MR. LOWNEY: Thirteen.

MR. ROGERS:  Sorry, 13.  My notes are wrong. 13 exhibits are on the record.  Thank you.

MR. LOWNEY:  And so, Investigator Doran, can you just briefly describe your training and experience as an industry operations investigator with ATF?

MR. DORAN:  Sure.  I've been an industry investigation -- industry operations investigator for six years.  Formal training included 10 weeks at the Federal Law Enforcement Training Center in Glynco, Georgia.  Upon graduation of our formal training, I completed one year of on-the-job training.

MR. LOWNEY:  And so you conducted a

compliance inspection of Paducah Shooters Supply?

MR. DORAN:  Yes, I did.

MR. LOWNEY:  Okay.  And I'll initially refer you to Exhibit 13.  So can you just describe what that document is and what it reflects?

MR. DORAN:  Okay.  So Exhibit 13 is a Report of Violation and the licensee's response to the violations.  And whenever the licensee's (audio interference) of reported violations would be generated, to document any violations found during the course of the inspection.  And then when we conduct the closing conference, we provide the licensee an opportunity to respond to the violations themselves.  And then we document those on the form as well.

MR. LOWNEY:  Okay.  So that exhibit just reflects what violations you cited and what the licensee's response to the -- those violations were?

MR. DORAN:  Yes.

MR. LOWNEY:  And so we'll go -- I'll

just refer to the notes revocation to the first violation, which is a background check violation.

MR. DORAN:  Yes.

MR. LOWNEY:  And I'll refer you to Exhibit 4.  And can you just describe what you identified with regards to the issues with background checks through the documentation?  Sounds like Exhibit 4.

MR. DORAN:  Exhibit 4 are a number of the ATF Forms, 4473s.  On the form itself, if a transfer is exempt from the NICS background check, the exemption document would be documented on Page 3.  Part of that documentation is the expiration date of the exemption document.  And in these cases, the NICS exemption document was actually expired at the time of transfer.

MR. LOWNEY:  Okay.  So in all three instances cited in this violation, it involved acceptance of a permit that had expired prior to the transaction taking place?

MR. DORAN:  That is correct.

MR. LOWNEY:  At, and at which point,

11

if the permit is expired, a NICS check is in fact required?

MR. DORAN:  That is correct.

MR. LOWNEY:  Go ahead and refer to the second, and gentlemen, at -- as -- after we get through this, you certainly can engage with us and ask questions of the investigator, you know, as it relates to each of these.  But I'll just walk through them, the documentation, and then you-all can then, you know, discuss them or ask questions.  The second violation was of one instance involving a transfer to an individual named John McCutchen on February 4, 2021, where no firearms transaction record was created.  Can you describe how you identified that issue?

MR. DORAN:  While reviewing forms involved in the transfer of firearms that fall under the purview of the National Firearms Act and approved Form 4 was located for John McCutchen, but the associated ATF Form 4473 could not be located with that.  When a Form 4 is actually approved for the transfer of an NFA

12

item, a 4473 must be completed to show that the transfer of the firearm has been executed from the Federal Firearms licensee to the non-licensee.

MR. LOWNEY:  And in terms of your conversation with the licensee about that transaction, what were you able to determine what exactly had happened or why there was no 4473?

MR. DORAN:  We were not able to find out exactly what's happened.  Chance and I had a conversation about it.  And then he went and spoke with John, and John came back and talked with Chance and I both, and John at that point just seemed to be unsure if he had completed one or not.

MR. LOWNEY:  And is John somebody who's associated with the business?

MR. DORAN:  John is -- go ahead.

MR. MCCUTCHEN:  Yeah, he's my brother-in-law.  He's my middle son that works there with us at Paducah Shooters Supply, yes.

MR. LOWNEY:  Okay.

13

MR. MCCUTCHEN:  John Caleb McCutchen. Here again, my middle son.  He can get it done.

MR. LOWNEY:  Okay, thank you.  So the third violation cited in the notice involves 11 instances where there was an error or omission associated with the certification part of the form.  And I'll refer you to Exhibit 5.  And again, and it's highlighted, gentlemen, wherever there was an issue.  But can you just describe what that finding was with regards to that particular part of the form and the issues?

MR. DORAN:  Yes, sir.  Exhibit 5 does represent a series of ATF Forms 4473s.  On these 4473s under Section B, there's a series of questions that the transferee must respond to either with a yes or a no response.  In these circumstances, many of them were actually a no response where the transferee did not respond one way or the other.  And then in some circumstances, if I'm not mistaken, there were a few responses where the transferee answered yes to a prohibiting question, which would indicate

that the licensee would either need to stop the transfer or clarify the response with the transferee to find out if they were to be prohibited.

MR. LOWNEY:  Thank you.  And refer you to the fourth violation in the notice is involving three transactions related to part 21 of the form.  And so if you can just describe what the issue with that particular violation is for those three instances.

MR. DORAN:  With part 21 of the form, in particular question 21A as in alpha, this question is a question that the transferee answers, indicating whether they are indeed actually want to be the actual transferee or the bottom of the form.  In these circumstances the transferee indicated that they were not by answering no on the form.  And again, in a circumstance like that, it would be a situation where the FFL would either need to stop the transfer of the firearm or engage the customer and just clarify their response and then

15

determine if it was just marked incorrectly.

MR. LOWNEY:  Thank you.  And so the next exhibit is 7.  And this relates to the fifth violation site of the notice of 10 instances where there were errors or omissions with regards to identification documents of the customer.  And if you could just, again, describe what -- and it's highlighted on the form what your findings were.

MR. DORAN:  Exhibit 7 is another series of ATF Forms 4473s.  With each one of these, well, during the course of a transfer, the licensee must identify the person that they're transferring a firearm to, and they document the source of identification on the ATF Form 4473. In some of these circumstances, the identification document was expired, which means that the transfer he would've needed to have produced another source of identification in order for the licensee to facilitate the transfer.  We'll look at a couple more of these forms.  There is a circumstance to where the

16

identification document was not annotated on the form in block 26A.  So that appears to be the situation there to where the information was either incomplete or the identification document itself was actually expired.

MR. LOWNEY:  And with regards to the sixth violation cited in the notice, there's 20 instances, and this relates to the NICS check section of the form.  And again, can you just briefly describe what the issues you identified with that particular portion of the form were for Violation 6?

MR. DORAN:  Yes, sir.  So for Violation 6 in Exhibit 8 is a series of ATF Forms 4473s for the purposes of a firearm transaction. If the transferee is not exempt from the criminal background check, the criminal background check is completed by the licensee and the licensee documents date, transaction serial number, and what the responses would be from NICS.  And in these circumstances and block 27A, B, C, and in some circumstances, block 27D, there was either

blank information or incorrect information documented in those blocks.

MR. LOWNEY:  And again, that's all highlighted on these exhibits?

MR. DORAN:  Yes, they are all highlighted.

MR. LOWNEY:  I'll refer you to, just in terms of the compliance history with licensee, just to briefly go over it.  So Exhibit 9 needed to describe what that reflects.

MR. DORAN:  Exhibit Number 9 is a Firearms Qualification Report that was completed by Industry Operations Investigator Doug Dillow on the 28th of January 2010.  But this qualification report is the formal documentation that ATF uses when we complete an onsite inspection for the Application of a Federal Firearms License.

MR. ROGERS:  For the record, it's Doug, D-O-U-G, last name D-I-L-L-O-W.

MR. DORAN:  Sorry.  Thanks Mike.

MR. LOWNEY:  And I -- also, I'm going

to back up briefly.  The -- there was also, I did not address Violation 7, which is 12 occasions where there were dispositions of firearms that could not be reconciled.

MR. DORAN:  Yes, sir.

MR. LOWNEY:  So I'll refer you to Exhibit 12 and just ask you to describe what your finding was with regards to those firearms.

MR. DORAN:  Exhibit 12 is a report that we used to document the loss or theft the firearms.  In this case it was a loss of firearms or lack of accountability of firearms.  But they are still reported on this form.  So during the course of the inspection, there were 12 firearms that between I, Chance, and some of the other employees of the FFL were not able to reconcile, and either find them in an inventory or find the associated document that would show their legal transfer to either a transferee or another license dealer.

MR. MCCUTCHEN:  So there was 12 at the time that you did this?

19

MR. DORAN:  Yes.

MR. MCCUTCHEN:  Have we found any since then?

MR. DORAN:  We found a couple of them, two or three that we've -- that we had turned up since then.

MR. LOWNEY:  Okay.

MR. MCCUTCHEN:  We've reported that found them, didn't we?

MR. DORAN:  Yes.

MR. LOWNEY:  Okay.  And you were aware of at least one --

(Simultaneous speaking.)

MR. DORAN:  I was aware at least one. That's correct.  And it may have been the first one that Clint got in touch with me because he was seeking guidance on how to get the loss report amended.

MR. LOWNEY:  Good.  And so   and we'll go back to the compliance history.  So we just discussed the initial application inspection.  So Exhibit 10 is documentation associated with the

20

2015 inspection.  And can you just briefly describe what that documentation was?

MR. DORAN:  Exhibit 10 is documentation of a warning conference with representatives of Paducah Shooters Supply.  And the warning conference is just one of the administrative actions that ATF will go through with a licensee to actually discuss the nature of their violations.  What the exhibit is, a copy of the reported violations from that inspection as well, along with an Acknowledgment of Federal Firearms Regulations that correspond with the same inspection in 2000 -- 2015.

MR. LOWNEY:  And the acknowledgment is just the document where the industry operations investigator reviewed the applicable laws and regulations with the licensee to make sure that, you know, being educated and kept current about requirements?

MR. DORAN:  Correct.  It is a brief overview of the rules, laws, and regulations associated with maintaining and operating a

21

Federal Firearms License.

MR. LOWNEY:  And then finally, Exhibit 11 is a -- some documentation from a 2017 compliance inspection.  And again, if you can just briefly describe what those documents are.

MR. DORAN:  Exhibit 11 is an Acknowledgment of Federal Firearms Regulations from an inspection that occurred in 2017.  With that as well is a report of violation from the 2017 inspection as well.  And again, the Acknowledgment of regulation, that is something that's reviewed with the industry operations investigator that conducts the inspection on the licensee.  And it's a brief overview of the rules, laws, and regulations, and the Report of Violation is an official documentation of the findings.

MR. MCCUTCHEN:  Was that before or after the fire?

MR. CLANAHAN:  Before.

MR. DORAN:  Just before the fire. Yes, sir.

MR. ROGERS:  2015.  You and I sat across at a little table.

(Simultaneous speaking.)

MR. DORAN:  Yeah, I think all three of us --

(Simultaneous speaking.)

MR. MCCUTCHEN:  Was that '15 or

MR. ROGERS:  Well, Doug was back in, I'm sorry --

MR. MCCUTCHEN:  That was in '15.

MR. DORAN:  The last one I just spoke of was the 2017 inspection but the one prior, but that was right before the fire.  Yes, sir.

MR. ROGERS:  Yeah, I'm sorry.

MR. MCCUTCHEN:  We -- that was '15, right?

MR. ROGERS:  That's May --

MR. MCCUTCHEN:  That was with the

MR. LOWNEY:  Yeah, there's -- that -- there's a May 22, 2017.  That's the most recent one before this.

MR. MCCUTCHEN:  September of '17 was

prior?

MR. DORAN:  Yeah.

MR. ROGERS:  Yeah.  2015 was IOI Eisert, Pam?

MR. MCCUTCHEN:  Yes.

MR. ROGERS:  Yeah.  And for the records is it -- it's E-I-S-E-R-T.  She did that inspection.  I mean, everybody was there.  I actually -- I met with you guys in our old office.  It was a tiny little conference table.

MR. LOWNEY:  And so just a as it relates to the current inspection and the violations, when you got to the site and interacting with the employees, was it, as far as the NICS violation, was that one employee that was involved with that?

MR. DORAN:  Yes, to my knowledge it was one employee that was associated with that. There were no other employees that had -- that were identified with transferring firearms with the NICS violations.

MR. LOWNEY:  And all those were

expired CCW permits?

MR. DORAN:  That is correct.

MR. LOWNEY:  And did you interact with that employee about that issue or what was happening?

MR. DORAN:  I did interact with an that employee.  If I'm not mistaken, was that Mr. Horn?

MR. ROGERS:  Yeah.

MR. DORAN:  Mr. Danny Horn, H-O-R-N. I did speak with Mr. Horn about it and Chance both about it, just trying to figure out why we would have, you know, an expired document, you know, documented on the ATF Form 4473.  Speaking with Mr. Horn, I really wasn't able to get, you know, any type of answer as to why that was actually occurring.  But after speaking with Chance and he and I were kind of troubleshooting, got to together a little bit, just talking off and on about it.  But you know, there was some discussion on, was there, you know, some type of a computer error or was the information on the

computer and the employee pulling the information from the computer?  Because again, some circumstances and an expired document was accepted, but it was found out that the person at the time of transfer actually had a valid permit in some circumstances.  But yeah, so with Mr. Horn, we were never able to really figure out -- I wasn't, anyway, able to really figure out where the expired information was actually coming from. And Chance may have more information on that now.

MR. CLANAHAN:  You know, I think some of it was pulled off of the computer.

MR. DORAN:  Okay.

MR. CLANAHAN:  And the biggest issue with that, it was just inattention on his part --

MR. DORAN:  Okay.

MR. CLANAHAN:  -- is what it boiled down to.  Talking and just inattention to detail on his part.

MR. DORAN:  Okay.

MR. MCCUTCHEN:  So Danny, how long (audio interference)?  Excuse me.  Retired deputy

26

sheriff here in the county, been here all his life.  How many years has he worked for us?  Approximately 14, several years.  He likes to talk, gets excited about talking about hunting or guns or whatever and doesn't pay attention.  I don't think any of this was intentional whatsoever, other than he just wasn't paying attention.

MR. CLANAHAN:  And we have corrected this now to where in order to mess this up now, you have to literally break our policy.  So whatever IDs, if we run -- if we put a driver's license as the form of identification in a concealed carry, as the -- to get around the NICS background check, then both forms of identification have to be entered in the computer.  And if either one of them show expired, it will not let you continue to carry that.

MR. LOWNEY:  Okay.

MR. CLANAHAN:  So that is with one of the later updates on our computer system, if

there's an expired ID, it will not let you proceed with the transaction. It pops up red and you can't even leave that screen until you corrected it.

MR. LOWNEY: And if I may, when we were originally doing the inspection, if you put in an expired concealed carry permit back then, so basically this was something you guys actually had to consult with the software developers about to get them to actually change --

MR. CLANAHAN: This is, actually, they just pushed me through about the same time or a little before, actually.

MR. DORAN: Okay.

MR. CLANAHAN: But one of the problems was, is if we got in there, and let's say we were running Mark, and if your driver's license was in there, but we were using a concealed carry, as long as your driver's license is in there, we didn't have to renew your concealed carry.

MR. DORAN: Right.

MR. CLANAHAN: But now our policy is

if we're using a concealed carry as an exemption, it has to be entered in the computer

MR. DORAN:  Okay.

MR. CLANAHAN:  So it automatically flags it if it's expired.

MR. DORAN:  Okay.

MR. ROGERS:  So I have a quick question on that.  And let me -- do you want continue first?  Because I can ask later.

MR. DORAN:  No, no, go ahead.

MR. ROGERS:  So you're talking about CCDW versus driver's license or the NICS exempt document for CCDW.  All the forms that you have on here are handwritten.  So let me just back into it.  I thought you guys were using ARS.  Are you still using ARS?  And so you just have updated it so that it has the purchaser's information, CCDW, or driver's license?

MR. CLANAHAN:  And it used to -- so if you bought a firearm, if we bleeped it when we put your name in there, if your driver's license was in there, we didn't enter the concealed

carry.

MR. ROGERS:  Okay.

MR. CLANAHAN:  Now if you're using a concealed carry as an exemption, if it's not already in there, we can -- it gets put in.

MR. ROGERS:  So that, does that fill the 4473, then?  Or is it just for the point-of-sale system?

MR. CLANAHAN:  It's just for the point of sale, but it won't let you proceed --

MR. ROGERS:  Okay.

MR. CLANAHAN:  -- with the sale if you've got an expired document.

MR. ROGERS:  Okay.  And it's, you said it's still ARS, right?

MR. CLANAHAN:  It's still is, and it's Access now.

MR. ROGERS:  Access.  Okay.

MR. CLANAHAN:  Yeah.  And we are looking at, on that same note, we are in the process of upgrading to electronic (audio interference) 30.  We're still -- we've paid our

money for it, and we're just waiting on them to get us all set up.  We're still probably three or four weeks away from being able to fully implement that.

MR. ROGERS:  Is it Access?

MR. CLANAHAN:  Uh-huh.

MR. ROGERS:  Yeah.  Okay.  I'm sorry Mark, go ahead.

MR. LOWNEY:  Yeah, so that was going to be my question.  So our you will or will have soon the capacity to have the customers do these forms electronically?

MR. MCCUTCHEN:  Yes, sir.

MR. CLANAHAN:  Yeah, hopefully in the next three, four weeks we'll have that fully implemented in all of our 4473s will be done electronically.

MR. MCCUTCHEN:  Which in your experience, is that going to cure this?  Is there any -- is my employees able to mess that up?

MR. ROGERS:  The short answer is the employees can always mess it up, but, and I'm not

31

-- I know a little bit about it, I'm not 100 percent familiar with the system, but generally speaking, any system that's been marketed has backstops in it. My recommendation is you work with the developer and whoever sold it to you to make sure that it's compliant with our -- you know, our ruling. The other issue that I want to convey is it doesn't -- can't blame the computer system. It's on you guys, simply. You -- the industry tries to do that. It doesn't work. It's on you guys. Much like your employees are responsible, you know --

(Simultaneous speaking.)

Yeah, but I mean, it is a good internal control to have because it, like you said, it pops up red. That right there gives you reason to pause.

MR. MCCUTCHEN: Yep.

MR. ROGERS: So --

MR. CLANAHAN: And I have played with it a little bit. I have the latest version Access with it installed. What they're trying to

do now, the way I take it is get it to where it runs through our whole system.  But I can get on there now and play with 4473s.  And I've entered wrong information just to see what happens, and it will automatically flag it as soon as you, if I put that, if I'm buying a handgun and I put my birthday as to where I'm not 21, it automatically ditches it.  Or if I list an expired driver's license or expired concealed carry, it automatically ditches it.

MR. DORAN:  The emphasis that I have with, well, one, I'll go back to your question just a touch more.  Just in my experiences with doing the inspections of the licensees is there do tend to be far fewer errors on the 4473s for those businesses using an electronic 4473 system that does have stops in place like what you're talking about, an incorrect date or something that's left blank.  And in these circumstances, had that already been in place, you can already tell that there are a lot of things that would have been caught.  The backside to that is the

understanding of the importance that there still has to be a set of eyes on those documents in those forms because, you know, a computer's not going to know if someone misspells a name or if someone writes down an incorrect state or the type of identification.  So there's going to be things that computer will not catch.  It just will not do it.  But just kind of think of it this way, as when you put that system in place, create a standard operating procedure that goes along with it.  But remember, that procedure will only be as good as the people who -- that are actually enforcing that procedure.  And it doesn't -- we can get into that a little bit more later with questions --

MR. MCCUTCHEN:  Yeah.  He had a lot better answer than most of you guys.

MR. ROGERS:  I have to be careful with what I say.  And we can talk about that offline --

MR. DORAN:  Right.

MR. ROGERS:  Kind of focus more on the

notice.  So Mark, yeah, I want to go back --

MR. LOWNEY:  Yeah, so, and just, I don't have any further questions for investigator Doran, so if you gentlemen have any questions of him, you're welcome to ask him.  Or anything else you would like to say associated with the violations that are cited here and, you know, your assessment of what was involved.

MR. CLANAHAN:  As far as what was involved, I don't know on a lot of them.  I still think it's just inattention, getting busy, not, you know, we had some computer glitches.  I showed you one or two of them where the computer was just -- obviously, the computer messed it up.  And that's hard to get around.  With -- now I think with some of the procedures we've got stopped -- we've got in place; I think that'll be much faster to catch.  It may not stop all of it, but it's still going to be a lot faster to catch.  I actually brought -- this is some of the stuff that we changed just since Mark was there.  And some of the stuff that we should have been doing

35

all along, probably.

MR. ROGERS:  For the record, we'll call this FFL Exhibit 1.

(Whereupon, the above-referred to document was marked as FFL Exhibit No. 1 for identification.)

MR. CLANAHAN:  The multiple sales was a -- is a big one.  And a lot of what happens because our computer flags most of the time.  We actually caught one Saturday; it didn't flag a multiple when we should've.  But our system flags multiple sales.  And instead of us, Okay, we're busy.  We'll pull it up at the end of the day, we'll go through it on all of them.  If you sell multiple handguns, and you, I don't care how busy we are, if you stop what you're doing, you go finish it up.  Not two hours later when it slows down because it gets over with.  So that was a big one. And we already went over the   as far as the background check with the expired IDs.  We're doing a quarterly inventory now to catch up with that.  We move a lot of guns, a lot of guns on

36

gun broker, and a lot of guns, unfortunately, to Illinois. And we -- there's actually been an update, matter of fact since I started working on this, on our system to where I can sell a gun to a person from Illinois, move it to a current tab, but it does not dispose of the firearm. So when they come back in, then we pull up their name and we dispose the firearm. To when before, we had to do a special-order deposit, and then there's no telling how many guns we found that were Illinois transfers that when the person come in, they had to sign the 4473, and they handed them the gun, and it never got disposed in the computer. So that was the huge one. All of our 4473s are being checked multiple times. We have, somebody checks it before the customer ever leaves the store. Most of the time before the customer's actually rang up on a firearm. And then it gets checked again at the end of the day. And then as they're in -- as they're put into our bound books, our actual books, they -- we double check every firearm to make sure the firearm with

disposed of properly so that nothing slips through the crack somehow.

MR. ROGERS:  Real quick, just reviewing exhibit.  Okay.  Yeah.  The number 10, it's got insuring all layaways in Illinois firearms.  You kind of explained that.  Okay.  So you had mentioned training.  Let back into it real quick.  How many employees do you have?

MR. CLANAHAN:  We have in the gun department, 9 or 10.

MR. ROGERS:  Okay.

MR. CLANAHAN:  And that's counting three bowmen.

MR. ROGERS:  Yeah.  So including 9 or 10, and the three, how many guns on average do you guys sell a year?  I saw the sign driving here you have over 3,000 guns.

MR. CLANAHAN:  There were thousands.

MR. ROGERS:  Yeah.  Mark, will you just, I don't remember off the top of my head.  That's why, if you can --

MR. LOWNEY:  I can pull it up here.

MR. CLANAHAN:  And I actually just looked at this every day and I don't remember.

MR. ROGERS:  I know it's a lot. That's --

MR. DORAN:  It is a lot.

MR. ROGERS:  Yeah.  Mark, will you just look it up over here -- so another question, just while Mark's looking that up, I know based on the letter that we sent you, that's in the record that you had another store in Eddyville. You guys closed that, right?

MR. CLANAHAN:  Yes.

MR. ROGERS:  Okay.  But just for the record, we've been out there, we inspected, we went over the regs with you guys, and the regulations with you -- so Mr. Horn was the one who completed all the, or sorry, conducted all of the NICS check transactions with the violations?

MR. CLANAHAN:  Yes.

MR. ROGERS:  Is he still in your employee?

MR. CLANAHAN:  Yes.

MR. ROGERS:  Okay.  Have you given him any -- or let me, well, have you given him any training or helped him along with this?

MR. CLANAHAN:  He had went through this with him.  And not just this, but just paying more attention to what you're doing and slowing down.  If you have to take the 4473 to the back room and go over it, do it.  But --

MR. ROGERS:  But --

MR. MCCUTCHEN:  You know, and then we've used him as an example with the other employees to try to just -- how important necessarily so he had to pay attention.

MR. ROGERS:  So you mentioned his prior employment.  He's a former -- or retired deputy.  So that leads me to believe, and correct me if I'm wrong, that you guys are concerned about public safety.  So having a sheriff there or a deputy there, he knows kind of the local feel for crime and things like that, I'm guessing?  Or at least knows what a bad guy looks like?  How about I -- yeah.  Leading me to

believe that you're concerned about public safety. You know, and let me ask this question. You -- this is maybe something that is kind of, seems kind of common or maybe low hanging fruit or low hanging fruit. You turn people away who maybe smell like marijuana, or you know to be prohibited. Okay. Say yes for me.

MR. CLANAHAN: Yes. And we push, like straw purchases. That is one of our -- we watch for straw purchases. Even -- we turn down people that probably shouldn't have been turned down for straw purchases because it was just too close to the line. We push straw purchases. And if we can't prove it's a straw purchase and think it's a straw purchase, as soon as they get down there, I take a picture of 4473, pass it on so they can investigate it.

MR. ROGERS: You pass it to --

MR. CLANAHAN: Jerry Jones.

MR. ROGERS: Is he --

MR. DORAN: For the record, it's Jones, J-O-N-E-S and he is an ATF task force

41

officer.

MR. ROGERS:  Yeah, thank you.

MR. MCCUTCHEN:  So I'm not in the store like I used to be.  Of course, next month we'll have been there 40 years.  And off the record, I'll tell you about my first inspection sometime.  But anyway, I'm not there as much. But it seems like I hear of or see it's almost weekly we turn away a straw purchase.  And a whole lot of them is people don't even realize what they're doing.  You know, I don't think -- there's a lot of women that don't have a clue what a boyfriend's asking them to do that they don't know until we explain to them or think through this.  You know, and then they say, Oh heck no, I'm -- I'd never do that.  But he didn't tell me this, you know.  But anyway, we look for it and because it is out there on a regular basis, whether it's really intentional or not intentional.  We do see it and we do stop it every time we suspect it.

MR. ROGERS:  Yeah.  Thank you.  So we

42

talked a little bit about the background check violations.  You're going to, you've already trained Mr. Horn.  You have internal controls that have been implemented to prevent this. Sounds like you've provided training to at least Mr. Horn.  Have you -- anyone else?

MR. CLANAHAN:  Oh, yeah.  We've been through, like the new list of procedures for pretty much everybody.

MR. ROGERS:  Okay.  And then you've implemented this -- you've updated ARS, now known as Access.  This, when we leave -- when you guys leave here, we -- I'll give you a couple days or a week or however -- will you send me some sort of documentation on that so that we can put on the record of what it is?

MR. CLANAHAN:  Sure.

MR. ROGERS:  Lynn has my email.  If you need it, I --

(Simultaneous speaking.)

MR. CLANAHAN:  Yeah, get it to me because I can email you the receipt and the new

43

update stuff, where we're doing that.

MR. ROGERS:  Yeah, just, just kind of, you don't even need to give me that.  Just whatever kind of propaganda they've given you or even if it's just a link --

MR. DORAN:  That's what it is.

MR. ROGERS:  They're just trying to sell you --

(Simultaneous speaking.)

MR. CLANAHAN:  Absolutely.

MR. ROGERS:  You know, the, Here's the form.  Buy it.  You know, that kind of stuff. Just send that to me so I can see what it does. And we can put it on the record to explain what internal controls we have.  And then you mentioned quarterly inventory.  Let's go back to that.  You have it?

MR. CLANAHAN:  Yes, sir.  I do.

MR. ROGERS:  Would you for the record please --

MR. CLANAHAN:  Yes.  And I'll go ahead and give you three different numbers here.  The

first number, total number of firearms and inventory during inspection was 1,792.  Total number of acquired firearms in the 12 months preceding the inspection was 6,110.  And the total number of ATF Forms 4473s reviewed was 4,689.

MR. ROGERS:  Thank you, sir.  So I'm going to go back to the last -- violation number 7, which was the failure to accurately record disposition.  So we talked about the 12 missing firearms you were able to recover minimally.  One that it sounds like we were able to get corrected -- or you were able to correct with IOI Doran.  So you mentioned a couple others.  Do you think there's --

MR. CLANAHAN:  I think there's a -- I think there was, I know there was a second because that was when I said something.  I texted you about it.

MR. ROGERS:  Okay.

MR. CLANAHAN:  Because I had a, actually, a second one that I needed to get done,

too.

MR. ROGERS:  Okay.

MR. CLANAHAN:  So there's -- I know there's been two.

MR. ROGERS:  Okay.  So just quick explain how you went back to find them.

MR. CLANAHAN:  One of them we found in just going through a -- we had already -- we were doing another inventory.  We found it in an inventory.  The other one was just blind luck, but we found it.  I'm going to be honest.  It was in a little tiny box that didn't look -- it was a Ruger LCP in a little tiny box.  It didn't look like a gun box.  It looked like a safe lock box and was sitting with a safe box.

MR. ROGERS:  Okay.

MR. MCCUTCHEN:  It was stacked up in the  we sell gun safes, of course, and change locks.  So I've got all these locks there.  And it was in one of those boxes in with the locks.

MR. CLANAHAN:  Wow.

MR. ROGERS:  Yeah, that's --

46

(Simultaneous speaking.)

MR. CLANAHAN:  And it's that stuff like that.

MR. ROGERS:  Yeah, that's luck.  Okay.

MR. MCCUTCHEN:  So it's in the inventory just -- it's in the building, but --

MR. DORAN:  Yeah.  Right.

MR. ROGERS:  And you, so you guys were able to report that to the tracing center?

MR. CLANAHAN:  Yes.

MR. ROGERS:  And you -- okay.

MR. CLANAHAN:  Yeah.

MR. DORAN:  That was, so the Ruger LCP pistol was one that was identified.  What's the other one?

(Simultaneous speaking.)

MR. CLANAHAN:  The Ruger was the one I reported.  Yeah.

MR. MCCUTCHEN:  And then there was --

MR. LOWNEY:  If you want to look at it, it's the very first exhibit has the list of, it's Exhibit Appendix G.  But it's a couple pages

in.

MR. CLANAHAN:  Exhibit 1?

MR. ROGERS:  Yep, yep.  You're close where your finger is.  Yeah, on the bottom.

MR. LOWNEY:  Bottom of the next page.

MR. MCCUTCHEN:  I --

MR. LOWNEY:  Yeah, so it goes on to -- so there's the list.  And like I said, the Ruger's the first one listed.

MR. CLANAHAN:  I don't remember, honestly.  Without going back and looking at my email where I emailed the tracing center.

MR. LOWNEY:  Okay.

MR. ROGERS:  If  yeah.  If you want, send that to me, will you, please?

(Simultaneous speaking.)

MR. LOWNEY:  Yeah, just let us know what's the second one that you identified was.

MR. ROGERS:  And I'll just, what I'll do is when I get your emails, I'll just put them in the record just so that we have it to show that it's done.  Yeah.  So there were silencers

on here, too.  So explain to me how you guys handled when the silencers come in.  It looks like there's at least three, a Tactical Innovation and Double Siren SilencerCo.

MR. CLANAHAN:  So the silencers, when they come in, one of them -- one of those was a transfer.  And we're actually still trying to get that lined out.  The SilencerCo, LLC, the Omega 36 was a transfer.  And now you would think if a customer hasn't been -- got their transfer, they're going to be all upset.  But so we called the people that did it.  They supposedly had paperwork showing where they had sent it to two different places.  So I'm still fighting that battle, but hitting somebody, and I don't remember off the top of my head who it -- the dealer's name.  But it has been a nightmare.

MR. ROGERS:  So is it -- was it not transferred to you guys?  Or was it went to your store but it's supposed to go to another?

MR. CLANAHAN:  That's right.  So we're trying to track that down still.  The Tactical

Innovations, we have looked, and we're still looking.  Double Star is actually an SDR.

MR. MCCUTCHEN:  It's not a silencer.

MR. ROGERS:  Okay.  I --

MR. CLANAHAN:  And I have tracked down what happened to that.  And I'm still trying to get it all figured out.  That rifle was in the inventory during the fire.

MR. ROGERS:  Okay.

MR. CLANAHAN:  And somehow ended up and got transferred out with the regular long guns.

MR. MCCUTCHEN:  Yes.

MR. CLANAHAN:  So I have contacted the people that bought all the long guns from us.  And I'm trying to get them to give me information to get that tracked back down.  And at that point I can get it back into me.  If nothing else, I'll pin and weld the flashlight on it and send it back to them and make it gun legal.  And we'll get it off of the --

MR. ROGERS:  And transfer.

MR. CLANAHAN:  -- of the registry.

MR. ROGERS:  Yeah, I mean, that's fine.  You can make it long if you want and just change the barrel out.

MR. CLANAHAN:  Right.

MR. MCCUTCHEN:  The insurance company sold all that inventory to one company.  So everything we know where it went to is just getting those people to cooperate.

MR. ROGERS:  Do you know who it?  Was it an FFL?  I'm assuming it was an FFL.

MR. CLANAHAN:  It is a discount.

MR. MCCUTCHEN:  That's all they do is buy tornado damage, flood damage, and then blow it all out, is what they do.

MR. CLANAHAN:  Wally -- Wall's Bargain Center --

MR. ROGERS:  Okay.

MR. CLANAHAN:  -- is who and that's who that firearm -- I end up and called them just on a wild hair and asked if they had it.  And I did finally track down that they did have it in

51

their records.

MR. ROGERS:  Okay.

MR. CLANAHAN:  But they're so big and they sell so much stuff.  And getting them to get to the information where it went is a whole nother deal altogether.

MR. ROGERS:  All right.  I'll try to follow up on our end on that.

MR. CLANAHAN:  Okay.

MR. DORAN:  Yeah, we may be able to track --

(Simultaneous speaking.)

MR. DORAN: -- we could probably get a -- compel an answer.

MR. ROGERS:  Yeah.

MR. CLANAHAN:  Yeah, they're going to listen to you-all on that.

MR. LOWNEY:  And just to put it on the record, so it sounds like some of this is associated with a fire at the business, and then subsequent disposition of some of these?  Can you just describe, you know, the -- basically the

basic details of what happened and how that affected the business?

MR. CLANAHAN:  So during -- after the fire, we had -- the majority of our firearms had smoke damage.  A lot of them had heat damage. And we literally -- and I think you were there. Did you come out?

MR. DORAN:  I didn't come out.

MR. CLANAHAN:  And we took all the firearms out.  We tried to divide everything up the best we could.  I didn't get rid of any Class 3 stuff.  I kept all the -- it was all, for the most part, in safes in the back.  So it was in relatively good condition, with the exception of the Double Star SVR.  So we pulled all the firearms, tried to clean them up as best we could to save them.  We put them in containers in the parking lot and padlocked the containers.  The only two keys to the containers, he had one and I had one.  So they were all in the parking lot and all contained.  The biggest issue we had after they were transferred, and it seems like it

popped back up every year up until this year, was firearms that kept showing back up on the thing that were disposed of, that should have went to Wall's Bargain Center. But it's like we delete them or dispose of them, and then they pop back up. And it was an ongoing --

(Simultaneous speaking.)

MR. DORAN: In the computer. In the computer. It was just, it was a nightmare. It was just a (audio interference).

MR. ROGERS: So how does that -- explain that. So you would dispose the firearm to Wall's Discount or Wall's Bargain, and then it would somehow come back in through --

MR. CLANAHAN: Have it back in the, like it wasn't disposed of correctly. So now I'm disposing if something like that pops up when it gets disposed of, I dispose of it myself, nobody knows where it's going.

MR. ROGERS: Okay.

MR. CLANAHAN: And what he had, and it's not necessarily her fault. It is, but we

54

had a girl that was doing a lot of our receiving. And we literally had a list of 2,000 guns. And she went through, and then the first inventory we did after that, when we got done with the inventory, we had like 800 guns missing. And I'm like, Oh my god. So I had to sit down and go through my list of guns, handwritten list of guns that weren't there, and that's how we marked them.

MR. ROGERS: But so you say missing. So you really, what you did was you did an inventory and then reconciled the inventory.

MR. CLANAHAN: That's right.

MR. ROGERS: Yeah. Because I mean, only with what we found here was 12.

MR. CLANAHAN: Yeah.

MR. ROGERS: I don't know that you reported anything else.

MR. CLANAHAN: No, these were immediately reconciled --

MR. ROGERS: Yeah.

MR. CLANAHAN: -- when we got done

with inventory.

MR. MCCUTCHEN:  So Mark, right after the fire, immediately after, didn't we do an inventory?

MR. DORAN:  Yes, sir.  And all firearms were accounted for.

MR. MCCUTCHEN:  And that was the thought even that night, the ATF was on the scene the night of the fire.  And the concern was somebody had stole a bunch of guns and set the building fire.

MR. DORAN:  Right.

MR. MCCUTCHEN:  That was the big concern.  And so we ruled that out real quick.

MR. DORAN:  Yes, sir.

MR. MCCUTCHEN:  You-all had a fire investigator there and all, which was a lot of help with (audio interference) but it was bad.

MR. ROGERS:  If you remember, you are our number one client.  So, or FFLs are at least. And then my analogy is it's similar to one of our former directors was like, If you're burglary,

you're arson, or whatever is like the -- to us like what the FBI has with bank robberies.  So you are our priority.

MR. MCCUTCHEN:  Well and I'll elaborate on this later to my first audit, but you're here to help me is the way I see you-all. And I've even asked for Mark to be there daily, you know, because my life would be a lot easier.

MR. ROGERS:  You've done that before.

MR. MCCUTCHEN:  But anyway --

MR. CLANAHAN:  Well, you know, Mark and I talk, we talk all the time.  Anytime I got questions I love to fire them at him.

MR. DORAN:  Very regularly.

MR. ROGERS:  Yeah, and it sounds like too, you have a relationship with our TFO who works with us.  And you contact them with, you know, straw sales or anything that seems suspicious and, yeah.  All right, so I may have jumped a little bit in.  I want to give you -- both of you an opportunity to explain anything else that you have regards to what's on the

notice. Again, you know, the -- whether it's background check violations, ATF Form 4473s or the record of acquisition and disposition. I've heard you say you've got internal controls that you've updated. You've updated or enhanced your record keeping system to an electronic version including an E4473 in a couple weeks. There potentially was a computer glitch that you think have resolved. It sounds like, based on the discussions with Mr. Horn, that you have reminded everyone that they need to pay attention. I'll use my words. You're not selling bubblegum, you're selling firearms. The -- let's see. You conduct quarterly inventories; you have standard operating procedures. You've figured out, and I think I know in other inspections you've had issues with transfers to Illinois. So it sounds like you've resolved that with the way you dispose of them. And that's kind of what I'm hearing, is why don't I give you an opportunity to clarify or further anything.

MR. CLANAHAN: You -- are you pretty

58

well hit on everything.  I tell you one big thing we started doing, which is - and I'm actually working on a completely new list of operating procedures.  I'm kind of dragging my feet on it because I'm waiting to get this electronic 4473 fully implemented because it's easy enough I can mess up where I know I need to mess up.  But I can't mess up like Joe Bubba from, you know, so I'm kind of dragging my feet, but I've worked on what I can.  Part of what we're doing is as soon as the gun walks in the door, as far as the shift in gun, it immediately gets received.  I don't care if we've got an invoice or not.  It used to be really bad about, Well, I don't have an invoice.  I don't care.  You got a packing slip, you got the gun, you know where it come from. Get it in the computer, go back and edit it later.  Even if it takes twice as much work, we going to go back and put the cost and sale price later.  That's been big so far on helping us.  A lot of the stuff that we've already implemented with the multiple checks on the 4473, we're

seeing less errors at the end of the day, which is good.  You know, used to, we check them and we're like, Well, you didn't date this.  You didn't, and generally it was on our side.  But now we're not seeing -- we're seeing very little.  So I think we finally got that problem corrected.

MR. ROGERS:  Mark, or IOI Doran, was there in, was it November you closed it out, Mark?  Or thereabout?

MR. DORAN:  Thereabouts.  Yes, sir.

MR. ROGERS:  So when -- give me a timeline of when you implemented all this.

MR. CLANAHAN:  Probably before we get it all closed out.

MR. ROGERS:  Okay.

MR. CLANAHAN:  Just almost immediately.  We started changing the way we're doing things.  And I'll be honest, I -- maybe I -- hasn't -- haven't been as involved in it as I needed to be.  And somebody there every day put the foot down and say, Listen, this has to happen.  But since then, things are getting

better.  We switched to blue ink pens on the 4473s.  That makes a, you can't believe the difference in the color of ink that it makes when you switch.  Really that's -- we've seen even less errors since we switched to all blue ink than --

MR. ROGERS:  Yeah.

MR. CLANAHAN:  -- than what we did before.

MR. ROGERS:  I have another question about -- other -- I asked you a little bit about Mr. Horn and his level of employment.  I'm going to ask you this because you own the business.  I'm being tactical in how I ask this.  Are you looking at hiring people or terminating people or, you know, the things that will -- what I'm asking is, are you going to make any changes in the people who are making the errors, whether that be, like I mentioned, training, termination, moving them to a soft goods department, moving, you guys have archery, right?  If I remember right.

61

MR. CLANAHAN:  Yes.

MR. ROGERS:  Yeah.  Moving someone to archery instead of -- you have nine people that sell guns, maybe consolidating it to, Look, your strength isn't selling guns.  Let's go sell soft goods.

MR. CLANAHAN:  Yes.

MR. MCCUTCHEN:  So to answer that, it's numerous family.  That, and I have a family business.  My three sons are there, my wife is there, my daughter's there, son-in-law's there.  So in the family meetings, business meetings, letting Mr. Horn go, terminating him has been a discussion many times there.  And he has not just long term been there, but he is the most honest employee I've got, probably.  He's a good Christian man and I firmly believe his only fault is just talking about the bear he killed and not what, this form is --

MR. ROGERS:  Yeah.

MR. MCCUTCHEN:  -- is on it.  So, you know, staying on him to just stay focused,

62

replacing him with somebody as honest and good would be hard to do at this date and time.

MR. ROGERS:  Yeah.  And I hear what you're saying.  I'm not saying you have to fire him.  If he has a skill to sell guns, he can sell guns.  But --

MR. MCCUTCHEN:  And yes.  And we just hired a man that came out of -- worked in the past several years out of two different gun stores.  And we just watch him like a hawk until we feel comfortable with everything he's doing.

MR. ROGERS:  And I used him as the example, but I mean, as reviewing some of the 4473s in here, there's other names in here have --

MR. MCCUTCHEN:  Yes.

MR. ROGERS:  -- have made mistakes. You know --

MR. CLANAHAN:  So I'm going to kind of expand on what he said.  He -- if it becomes repetitive behavior, this is our livelihood.  If it, obviously would with Dave Horn it was at

least repetitive a couple times.  I think that's corrected now.  But if it becomes repetitive, they'll have to go.  It's not worth us losing our livelihood over -- even if they are friends, even if they are -- they've been around so much they're like family.  We -- there's one name in here that I saw pop up a bunch.  He has actually passed away now.

MR. ROGERS:  Oh.

MR. CLANAHAN:  He -- James Chatellier.

MR. ROGERS:  Yep.

MR. CLANAHAN:  He had a brain tumor.  And I'll be honest with you.  I knew I needed to fire him, but I didn't have the heart.  We tried to keep a watch on him as good as we could, but he's had brain tumors, he's had other cancers.  And I just didn't have the heart to get rid of him.  We tried to keep tabs on him, keep his mess ups to a minimum.  But --

MR. ROGERS:  Yeah.  Yeah, I mean, like I said, and I'm not -- you don't necessarily have to terminate them.  You can remove them from 4473

64

or record of acquisition in this position duties. Again, there's a skill in talking to people about how you know, the last bear you got.  And there's a skill in selling firearms, especially when it comes to the hard sell versus, you know -- so I -- yeah, go ahead, mister.

MR. MCCUTCHEN:  Well, the only thing I got to add here is just having excuse.  And it's a blessing too, but our business has literally doubled in about 19 and 2000 -- 2020, we were at half of what we're doing in the last two or three years.  So it's growing pains or whatever, but handling so many more guns, we've made that many more mistakes.  And --

MR. ROGERS:  And again, I -- I'm -- I understand that.  I understand volume has peaked through, you know, with those years.  And I mean, again, six -- over 6,000 firearms, you know, over 4,500 4473s, that doesn't include the dealer to dealer transfers we've done that, you know, I understand that --

MR. MCCUTCHEN:  Well, so every dealer

transfer we do, we still make a 4473.

MR. ROGERS:  Oh, okay.

MR. MCCUTCHEN:  It just, we did that years ago because it cut out losing some paperwork and all.  And so we do have a -- and we just make a line across it, put FFL, but we do put the report information on it.

MR. ROGERS:  Yeah.  Okay.

MR. MCCUTCHEN:  Just make it easier for us to train.

MR. ROGERS:  Okay.  Just a quick kind of mindfulness of time.  It's 11:06.  Does anybody need a break?

MR. MCCUTCHEN:  If this goes much longer, I'd like to get rid of some coffee.

MR. ROGERS:  We can -- I don't expect to go much longer.  I don't want to put a time limit.  I want to give you guys --

MR. MCCUTCHEN:  If I get hurting, I'll let you know.

MR. ROGERS:  Yeah.  Say the word.  I want to give you as much time as you feel you

need. We've got, again, I don't want to feel like you're restricted. This -- where we'll go from here is I'll allow you some time. I'll allow the government to kind of give a closing, explain everything. You have questions, we can -- Mark Lowney, you can have anything to shore it up. I'll give you guys an opportunity to close and shore it up. And then I will -- I'll do a closing. So my closing is about 30 seconds. So --

MR. CLANAHAN: You know, I think we've -- I mean, I thought we'd learned a lot when we met with you in 2015. I'm not making excuses, but we've had a lot go on since 2015 with the fire and then COVID. And literally our business went 4.5 million to (audio interference). And we've suffered growing pains that it's been a struggle for us to keep up with. Our operating procedures, and we've actually talked about this, we're not a mom-and-pop business anymore. It's just, we're not that business. You know, when I started 20 years ago, you can kind of fly by the

seat of your pants and keep everything under control because we didn't sell that many guns. We wasn't doing the volume that we're doing. It's not that way anymore. We just can't operate under a mom-and-pop strategy. So we're putting more operating procedures into place. I really do, especially even talking to with the boys, they understand the magnitude of where we're at now and what this could cost us and what it could cost them. It's not just us, it's, you know, they could very well lose their jobs, too.

MR. ROGERS: Right.

MR. CLANAHAN: So I do think that we have learned this time. And we've learned that our operating procedures are only as good as the person enforcing them. And that's going to be important. Moving forward with us, making sure that they're implemented. And not just putting them on paper, but that everybody's following it every day. This is what we do, there's no exceptions. You know, on -- it's easy to make exceptions on some stuff, but when it comes to

68

this kind of stuff, there's no exceptions.  It has to be done this way.  No excuses why it wasn't -- there's no excuse.  It's got to be done.

MR. ROGERS:  All right.  If you're okay, I'll allow the government to close and I'll give you guys an opportunity to kind of circle back, give me a closing.  Closing generally is kind of quick explanation of why we're here and, you know, what you think -- where you think you are.  Mr. Lowney, I'll allow you to go ahead.

MR. LOWNEY:  Yeah, I don't have really much else other than I would say, just to clarify for the record, you know, who you-all employ is absolutely up to you.  You know, it's your business.  So again, I think part of that discussion today is just about, you know, our emphasis would be if you're able to keep the license going forward, to make sure that in particular the people selling the guns and creating and maintaining the records are people that, you know, are -- you know, you trust to do

69

it completely and thoroughly and properly, or to review it, you know, because, you know, as you know, your livelihoods depend on the, you know, maintaining and keeping track of, you know, accurate, thorough, completed forms, you know, keeping track of the inventory.  You know, all those things are vital to holding a federal firearms license.  You know, so just be mindful of that with -- in terms of the employees that you entrust to do those particular tasks.

MR. ROGERS:  Gentlemen, I'll give you, you know, whatever time you feel necessary to kind of give us a closing.  Just give us an explanation of why we're here, what -- you know, what you think.  And you don't need to.  I'm not, you can say nothing as well.  I'm going to give you-all the options, but you have time if you need it.

MR. MCCUTCHEN:  Well, we fell short of doing business in the correct way is very apparent.  And going forth, we don't have but one option, and that's to cure our mistakes and do

70

every little thing we can to comply with the regulations, be it more training, more particular who we hire, seeing repeated mistakes quicker, and doing what we need to do with that employee to stop it in the future.  But this is my life for 40 years.  And we're there to do the right thing.  We've just built the business there.  You don't stay there 40 years if you're doing things really the wrong way.  I'd have probably already been gone a long time ago, but we do want do what's right in every way.

MR. ROGERS:  Anything else?

MR. CLANAHAN:  You know, I -- the one big thing I've got is I hope that everybody knows that this is not doable -- you know, our reputations are important.  And we would never do anything that we thought was wrong or that we thought we were skirting around something. Everything we do, we try to do by the book.  Even to the point of going out on the limb to help with investigations or even calling some stuff in that would liable to wind up, you know, with some

71

bad people upset at us if they found out we did it.  So, you know, it was honest mistakes that should have been caught that wasn't, is what it boils down to.

MR. ROGERS:  Thank you.  I'll close it out and we can finish.  I believe I have all the information that I need here, with the exception of the emails that we were going to have.  I'll make my final decision based on what was provided at the hearing today, those emails, and the record before me, which includes those.  If the decision is that the license is not to be revoked, you will receive that notice in writing. If -- in the event that it is determined that the license will be revoked, you'll receive a final notice of denial of application, revocation, suspension, and/or fine of firearms license. You'll receive a copy of my findings and conclusions as well.  If you receive a final notice, you may file a request in Federal District Court in the district where you conduct business under the provisions of Section 923F3,

Title 18, United States Code, or a de novo hearing. This request must be submitted within 60 days of the receipt of the final notice. As I mentioned, you guys are going to send me some emails regarding the, any other standing operating procedures, the information provided from Access, the computerized record keeping system. And then if you find anything else that you, with regards to the trace, I'm sorry, the missing firearms, anything else that you feel relevant for the record, I'll accept.

MR. CLANAHAN: Okay.

MR. ROGERS: I'm kind of loose with this, but how about a couple weeks, maybe? I understand you guys have a business running and you have other things to do.

MR. CLANAHAN: I hope that'd be the weekend.

MR. ROGERS: That's perfect.

MR. CLANAHAN: I mean, maybe next week or in the next 24 hours.

MR. ROGERS: Yeah, and if you need

73

something, if something comes up, just send me an email.  I'll give you my card and you guys can email me.  So with that, if there's, is there anything else that anyone would like to add?  Government?

MR. LOWNEY:  No.

MR. ROGERS:  Licensee?  Nothing else from the licensee?  The time is currently 11:14.  And then the hearing has ended.  The record is still open.  We'll go off the record.

(Whereupon, the above-entitled matter went off the record at 11:14 a.m.)

**A**

A-N-A-H-A-N 5:18
a.m 1:18 4:2,4 73:12
able 12:7,9 18:16 24:15 25:7,8 30:3,20 44:11 44:12,13 46:9 51:10 68:18
above-entitled 1:17 73:11
above-referred 8:2 35:4
absolutely 43:10 68:15
accept 72:11
acceptance 10:19
accepted 25:4
Access 29:17,18 30:5 31:22 42:12 72:7
accountability 18:12
accounted 55:6
accurate 5:6 69:5
accurately 44:9
acknowledgment 7:13 20:11,14 21:7,11
acquired 44:3
acquisition 57:3 64:1
Act 11:18
actions 20:7
actual 14:15 36:21
Adam 1:19 4:7
add 64:8 73:4
address 5:2 18:2
administrative 4:13 20:7
Agency 1:11 2:6 3:6
ago 65:4 66:22 70:10
ahead 6:12 11:4 12:18 28:10 30:8 43:21 64:6 68:11
Alcohol 1:2 4:11
allow 66:3,4 68:6,11
alpha 14:12
altogether 51:6
amended 19:18
analogy 55:21
and/or 4:15 6:15 71:17
annotated 16:1
answer 24:16 30:21 33:17 51:14 61:8
answered 13:21
answering 14:18
answers 5:6 14:14
anybody 65:13
anymore 66:20 67:4
Anytime 56:12
anyway 25:8 41:7,17 56:10
apparent 69:21
APPEARANCES 2:1
appears 16:2

Appendix 46:22
applicable 20:16
application 7:9 17:17 19:21 71:16
approved 11:19,22
Approximately 26:3
archery 60:21 61:3
ARS 28:15,16 29:15 42:11
arson 56:1
asked 50:21 56:7 60:11
asking 41:13 60:17
assessment 34:8
associated 6:21 7:2,4,6 7:11 11:20 12:17 13:6 18:18 19:22 20:22 23:18 34:6 51:20
assuming 50:11
ATF 2:8 4:16,19 5:21 6:20 7:1,3 8:14 10:10 11:20 13:13 15:11,15 16:14 17:16 20:7 24:14 40:22 44:5 55:8 57:2
attention 26:5,8 39:6,13 57:11
audible 5:7
audio 9:10 25:22 29:21 53:10 55:18 66:16
audit 56:5
authority 4:10
automatically 28:4 32:5 32:7,10
average 37:15
aware 19:11,14

**B**

B 13:14 16:21
back 12:12 18:1 19:20 22:8 27:7 28:14 32:12 34:1 36:7 37:7 39:8 43:16 44:8 45:6 47:11 49:17,18,20 52:13 53:1,2,5,14,15 58:17 58:19 68:8
background 10:2,7,11 16:17,17 26:15 35:20 42:1 57:2
backside 32:22
backstops 31:4
bad 39:21 55:18 58:14 71:1
bank 56:2
Bargain 50:16 53:4,13
barrel 50:4
based 38:8 57:9 71:9
basic 52:1
basically 27:8 51:22

basis 41:19
battle 48:15
bear 61:18 64:3
behalf 2:2,6 5:10,21
behavior 62:21
believe 39:16 40:1 60:2 61:17 71:6
best 52:11,16
better 33:17 60:1
big 35:8,19 51:3 55:13 58:1,20 70:14
biggest 25:14 52:21
birthday 32:7
bit 24:19 31:1,21 33:14 42:1 56:20 60:11
blame 31:8
blank 17:1 32:19
bleeped 28:20
blessing 64:9
blind 45:10
block 16:2,21,22
blocks 17:2
blow 50:14
blue 60:1,5
boiled 25:17
boils 71:4
book 70:19
books 36:21,21
bottom 14:16 47:4,5
bought 28:20 49:15
Boulevard 1:15 4:6
bound 36:21
bowmen 37:13
box 45:12,13,14,14,15
boxes 45:20
boyfriend's 41:13
boys 67:7
brain 63:12,16
break 26:11 65:13
brief 20:20 21:14
briefly 8:12 16:10 17:9 18:1 20:1 21:5
broker 36:1
brother- 12:19
brought 34:20
Bubba 58:8
bubblegum 57:12
building 46:6 55:11
built 70:7
bunch 55:10 63:7
Bureau 1:2 4:11
burglary 55:22
business 12:17 51:20 52:2 60:13 61:10,12 64:9 66:15,20,21 68:16 69:20 70:7 71:22 72:15
businesses 32:16

busy 34:11 35:13,15
buy 43:12 50:14
buying 32:6

**C**

C 16:21
C-C-U-T-C-H-E-N 5:14
C-L- 5:17
Caleb 13:1
call 35:3
called 48:11 50:20
calling 70:21
cancers 63:16
capacity 30:11
card 73:2
care 6:13 35:15 58:13 58:15
careful 33:18
carry 26:14,18 27:7,18 27:20 28:1 29:1,4 32:9
case 18:11
cases 10:15
catch 33:7 34:18,19 35:21
caught 32:22 35:10 71:3
CCDW 28:12,13,18
CCW 24:1
center 8:19 46:9 47:12 50:17 53:4
Central 4:3
certainly 11:6
certification 13:6
Chance 2:4 5:17 12:10 12:13 18:15 24:11,18 25:10
change 27:10 45:18 50:4
changed 34:21
changes 60:17
changing 59:17
Chatellier 63:10
check 10:2,12 11:1 16:8 16:17,17 26:15 35:20 36:22 38:18 42:1 57:2 59:2
checked 36:15,19
checks 10:7 36:16 58:22
Christian 61:17
circle 68:7
circumstance 14:19 15:22
circumstances 13:17 13:20 14:16 15:16 16:21,22 25:3,6 32:19
cited 7:2,4,7 9:18 10:18

13:4 16:7 34:7
**Civil** 4:16 6:15
**Clanahan** 2:4 5:17,17
21:20 25:11,14,17
26:9,21 27:11,15,22
28:4,19 29:3,9,12,16
29:19 30:6,14 31:20
34:9 35:7 37:9,12,18
38:1,12,19,22 39:4
40:8,19 42:7,17,21
43:10,18,21 44:16,21
45:3,7,21 46:2,10,12
46:17 47:2,10 48:5,21
49:5,10,14 50:1,5,12
50:16,19 51:3,9,16
52:3,9 53:15,21 54:13
54:16,19,22 56:11
57:22 59:13,16 60:8
61:1,7 62:19 63:10,12
66:11 67:13 70:13
72:12,17,20
**clarify** 14:2,22 57:21
68:13
**Class** 52:11
**clean** 52:16
**clear** 5:6
**client** 55:20
**Clint** 19:16
**close** 40:12 47:3 66:7
68:6 71:5
**closed** 38:11 59:8,14
**closing** 9:13 66:4,9,9
68:8,8 69:13
**clue** 41:12
**Code** 4:17 72:1
**coffee** 65:15
**color** 60:3
**come** 36:7,11 48:2,6
52:7,8 53:14 58:16
**comes** 64:5 67:22 73:1
**comfortable** 62:11
**coming** 25:9
**common** 40:4
**company** 50:6,7
**compel** 51:14
**complete** 17:16
**completed** 8:20 12:1,14
16:18 17:12 38:17
69:5
**completely** 58:3 69:1
**compliance** 7:11,19 9:1
17:8 19:20 21:4
**compliant** 31:6
**comply** 70:1
**computer** 24:22 25:1,2
25:12 26:17,22 28:2
31:8 33:7 34:12,13,14
35:9 36:14 53:8,9

57:8 58:17
**computer's** 33:3
**computerized** 72:7
**concealed** 26:14 27:7
27:18,20 28:1,22 29:4
32:9
**concern** 55:9,14
**concerned** 39:17 40:1
**conclusions** 71:19
**condition** 52:14
**conduct** 9:13 57:14
71:21
**conducted** 8:22 38:17
**conducts** 21:13
**conference** 9:13 20:4,6
23:10
**consolidating** 61:4
**consult** 27:9
**contact** 56:17
**contacted** 49:14
**contained** 52:21
**containers** 52:17,18,19
**CONTENTS** 3:1
**continue** 26:18 28:9
**control** 31:15 67:2
**controls** 42:3 43:15
57:4
**conversation** 12:6,11
**convey** 31:8
**cooperate** 50:9
**copies** 7:5
**copy** 20:9 71:18
**correct** 10:21 11:3
19:15 20:20 24:2
39:16 44:13 69:20
**corrected** 26:9 27:4
44:12 59:6 63:2
**correctly** 53:16
**correspond** 20:12
**cost** 58:19 67:9,10
**Counsel** 6:3
**counting** 37:12
**county** 26:1
**couple** 5:2 15:21 19:4
42:13 44:14 46:22
57:7 63:1 72:14
**course** 9:12 15:12
18:14 41:4 45:18
**Court** 71:21
**COVID** 66:15
**crack** 37:2
**create** 33:10
**created** 11:14
**creating** 68:21
**crime** 39:20
**criminal** 16:16,17
**CROSS** 3:2
**CST** 1:18

**cure** 30:19 69:22
**current** 20:18 23:12
36:5
**currently** 73:8
**customer** 14:21 15:6
36:16 48:10
**customer's** 36:18
**customers** 30:11
**cut** 65:4

**D**

**D-I-L-L-O-W** 17:20
**D-O-R-A-N** 6:5
**D-O-U-G** 17:20
**daily** 56:7
**damage** 50:14,14 52:5
52:5
**Danny** 24:10 25:21
**date** 4:4 6:19 10:14
16:19 32:18 59:3 62:2
**dated** 6:15,17
**daughter's** 61:11
**Dave** 62:22
**day** 35:13 36:19 38:2
59:1,20 67:20
**days** 42:13 72:3
**de** 72:1
**deal** 51:6
**dealer** 18:20 64:19,20
64:22
**dealer's** 48:17
**December** 6:17
**decision** 71:9,12
**delete** 53:4
**denial** 71:16
**department** 1:1,10 4:12
37:10 60:20
**depend** 69:3
**deposit** 36:9
**deputy** 25:22 39:16,19
**describe** 8:12 9:5 10:5
11:15 13:9 14:8 15:7
16:10 17:10 18:7 20:2
21:5 51:22
**detail** 25:18
**details** 52:1
**determine** 12:7 15:1
**determined** 71:14
**developer** 31:5
**developers** 27:9
**difference** 60:3
**different** 43:22 48:14
62:9
**Dillow** 17:13
**DIRECT** 3:2
**direction** 4:10
**director** 1:19 4:7
**directors** 55:22

**discount** 50:12 53:13
**discuss** 11:10 20:8
**discussed** 19:21
**discussion** 24:21 61:14
68:17
**discussions** 57:10
**dispose** 36:6,8 53:5,12
53:18 57:19
**disposed** 36:13 37:1
53:3,16,18
**disposing** 53:17
**disposition** 44:10 51:21
57:3
**dispositions** 18:3
**district** 71:21,21
**ditches** 32:8,10
**divide** 52:10
**Division** 1:20 2:8 4:8
6:3,4
**doable** 70:15
**document** 9:5,11,15
10:12,14,15 15:14,17
16:1,4 18:10,18 20:15
24:13 25:3 28:13
29:13 35:5
**documentation** 10:7,13
11:9 17:15 19:22 20:2
20:4 21:3,16 42:15
**documented** 10:12
17:2 24:14
**documents** 7:11 8:3
15:6 16:19 21:5 33:2
**doing** 27:6 32:14 34:22
35:16,21 39:6 41:11
43:1 45:9 54:1 58:2
58:10 59:18 62:11
64:11 67:3,3 69:20
70:4,8
**door** 58:11
**Doran** 6:5,5 8:12,15 9:2
9:7,21 10:3,9,21 11:3
11:16 12:9,18 13:12
14:11 15:10 16:13
17:5,11,21 18:5,9
19:1,4,10,14 20:3,20
21:6,21 22:4,11 23:2
23:17 24:2,6,10 25:13
25:16,20 27:14,21
28:3,6,10 32:11 33:21
34:4 38:5 40:21 43:6
44:13 46:7,13 51:10
51:13 52:8 53:8 55:5
55:12,15 56:14 59:7
59:10
**double** 36:21 48:4 49:2
52:15
**doubled** 64:10
**Doug** 17:13,20 22:8

dragging 58:4,9
driver's 26:12 27:17,19
  28:12,18,21 32:8
driving 37:16
duties 64:1

**E**

E 4:18
E-I-S-E-R-T 23:7
E4473 57:7
easier 56:8 65:9
easy 58:6 67:21
Eddyville 38:10
edit 58:17
educated 20:18
Eisert 23:4
either 13:16 14:1,20
  16:4,22 18:17,19
  26:17
elaborate 56:5
electronic 29:21 32:16
  57:6 58:5
electronically 30:12,17
email 42:18,22 47:12
  73:2,3
emailed 47:12
emails 47:20 71:8,10
  72:5
emphasis 32:11 68:18
employ 68:14
employee 23:15,18
  24:4,7 25:1 38:21
  61:16 70:4
employees 18:16 23:14
  23:19 30:20,22 31:11
  37:8 39:12 69:9
employment 39:15
  60:12
ended 49:10 73:9
Enforcement 8:18
enforcing 33:13 67:16
engage 11:6 14:21
enhanced 57:5
enter 28:22
entered 26:16 28:2 32:3
entrust 69:10
error 13:5 24:22
errors 15:5 32:15 59:1
  60:5,18
especially 64:4 67:7
ESQ 2:7
event 71:14
everybody 23:8 42:9
  70:14
everybody's 67:19
evidence 4:21 5:21 8:5
exactly 12:8,10
example 39:11 62:13

exception 52:14 71:7
exceptions 67:21,22
  68:1
excited 26:4
excuse 25:22 64:8 68:3
excuses 66:13 68:2
executed 12:2
exempt 10:11 16:16
  28:12
exemption 10:12,14,15
  28:1 29:4
exhibit 3:5 6:14,16,18
  6:20,22 7:3,5,8,10,12
  7:15,19 8:3 9:4,7,17
  10:5,8,9 13:7,12 15:3
  15:10 16:14 17:9,11
  18:7,9 19:22 20:3,9
  21:2,6 35:3,5 37:4
  46:21,22 47:2
exhibits 6:12 7:22 8:6
  8:10 17:4
expand 62:20
expect 65:16
experience 8:13 30:19
experiences 32:13
expiration 10:14
expired 10:16,19 11:1
  15:17 16:5 24:1,13
  25:3,9 26:18 27:1,7
  28:5 29:13 32:8,9
  35:20
explain 41:14 43:14
  45:6 48:1 53:12 56:21
  66:5
explained 37:6
explanation 68:9 69:14
Explosives 1:2 4:12
eyes 33:2

**F**

facilitate 15:20
fact 11:1 36:3
failure 44:9
fall 11:17
familiar 31:2
family 61:9,9,12 63:6
far 23:14 32:15 34:9
  35:19 58:11,20
faster 34:18,19
fault 53:22 61:17
FBI 56:2
February 1:14 4:4
  11:13
federal 4:17 7:13,16
  8:18 12:3 17:17 20:11
  21:1,7 69:7 71:20
feel 39:20 62:11 65:22
  66:1 69:12 72:10

feet 58:4,9
fell 69:19
fewer 32:15
FFL 3:8 14:20 18:16
  35:3,5 50:11,11 65:6
FFLs 55:20
Field 1:20 2:8 4:8 6:4
fifth 15:3
fighting 48:14
figure 24:12 25:7,8
figured 49:7 57:15
file 71:20
filed 7:17
fill 29:6
final 71:9,15,19 72:3
finally 21:2 50:22 59:6
find 12:9 14:3 18:17,17
  45:6 72:8
finding 13:10 18:8
findings 15:8 21:17
  71:18
fine 4:16 5:1 6:15 50:3
  71:17
finger 47:4
finish 35:17 71:6
fire 21:19,21 22:13 49:8
  51:20 52:4 55:3,9,11
  55:16 56:13 62:4
  63:14 66:15
firearm 12:2 14:21
  15:14 16:15 28:20
  36:6,8,18,22,22 50:20
  53:12
firearms 1:2 4:11 6:21
  7:1,3,6,8,13,15,16,16
  11:14,17,18 12:3
  17:12,18 18:3,8,11,11
  18:12,14 20:12 21:1,7
  23:20 37:6 44:1,3,11
  52:4,10,16 53:2 55:6
  57:13 64:4,18 69:8
  71:17 72:10
firmly 61:17
first 10:1 19:15 28:9
  41:6 44:1 46:21 47:9
  54:3 56:5
flag 32:5 35:10
flags 28:5 35:9,11
flashlight 49:19
flood 50:14
fly 66:22
focus 4:21 33:22
focused 61:22
follow 51:8
following 67:19
foot 59:21
force 40:22
form 4:16,19 9:16 10:10

11:19,20,21 13:7,11
  14:8,11,16,18 15:8,15
  16:2,9,11 18:13 24:14
  26:13 43:12 57:2
  61:19
formal 8:17,20 17:15
former 39:15 55:22
forms 6:20 7:1,3 10:10
  11:16 13:13 15:11,22
  16:14 26:15 28:13
  30:12 33:3 44:5 69:5
forth 69:21
forward 67:17 68:19
found 9:11 19:2,4,9
  25:4 36:10 45:7,9,11
  54:15 71:1
four 30:3,15
fourth 14:6
friends 63:4
fruit 40:4,5
full 5:11,22
fully 30:3,15 58:6
further 34:3 57:21
future 70:5

**G**

G 46:22
generally 31:2 59:4
  68:8
generated 9:11
gentlemen 11:5 13:8
  34:4 69:11
Georgia 8:19
getting 34:11 50:9 51:4
  59:22
girl 54:1
give 5:10,22 42:13 43:3
  43:22 49:16 56:20
  57:20 59:11 65:18,22
  66:4,7 68:7,8 69:11
  69:13,13,16 73:2
given 39:1,2 43:4
gives 31:16
glitch 57:8
glitches 34:12
Glynco 8:19
go 6:12 9:22 11:4 12:18
  17:9 19:20 20:7 28:10
  30:8 32:12 34:1 35:14
  35:16 39:8 43:16,21
  44:8 48:20 54:6 58:17
  58:19 61:5,13 63:3
  64:6 65:17 66:2,14
  68:11 73:10
god 54:6
goes 33:10 47:7 65:14
going 17:22 30:9,19
  33:4,6 34:19 42:2

44:8 45:8,11 47:11
48:11 51:16 53:19
58:19 60:12,17 62:19
67:16 68:19 69:16,21
70:20 71:8 72:4
**good** 19:19 31:14 33:12
52:14 59:2 61:16 62:1
63:15 67:15
**goods** 60:20 61:6
**government** 7:22 8:3
66:4 68:6 73:5
**graduation** 8:20
**granted** 4:20
**growing** 64:12 66:17
**guessing** 39:21
**guidance** 19:17
**gun** 36:1,4,13 37:9
45:14,18 49:20 58:11
58:12,16 62:9
**guns** 26:5 35:22,22
36:1,10 37:15,17
49:12,15 54:2,5,7,7
55:10 61:4,5 62:5,6
64:13 67:2 68:20
**guy** 39:21
**guys** 23:9 27:8 28:15
31:9,11 33:17 37:16
38:11,15 39:17 42:12
46:8 48:1,19 60:21
65:18 66:7 68:7 72:4
72:15 73:2

**H**

**H-O-R-N** 24:10
**hair** 50:21
**half** 64:11
**handed** 36:12
**handgun** 32:6
**handguns** 35:15
**handled** 48:2
**handling** 64:13
**handwritten** 28:14 54:7
**hanging** 40:4,5
**happen** 59:22
**happened** 12:8,10 49:6
52:1
**happening** 24:5
**happens** 32:4 35:8
**hard** 34:15 62:2 64:5
**hawk** 62:10
**head** 5:8 37:20 48:16
**hear** 41:8 62:3
**heard** 57:4
**hearing** 1:3,18 4:9,13
4:14,20,21 6:17,19
57:20 71:10 72:2 73:9
**heart** 63:14,17
**heat** 52:5

**heck** 41:16
**help** 55:18 56:6 70:20
**helped** 39:3
**helping** 58:20
**highlighted** 13:8 15:8
17:4,6
**hire** 70:3
**hired** 62:8
**hiring** 60:15
**history** 17:8 19:20
**hit** 58:1
**hitting** 48:15
**holding** 69:7
**honest** 45:11 59:18
61:15 62:1 63:13 71:2
**honestly** 47:11
**hope** 70:14 72:17
**hopefully** 30:14
**Horn** 24:8,10,11,15
25:7 38:16 42:3,6
57:10 60:12 61:13
62:22
**hours** 35:17 72:21
**huge** 36:14
**hunting** 26:4
**hurting** 65:19

**I**

**ID** 27:1
**identification** 8:4 15:6
15:15,17,19 16:1,4
26:13,16 33:6 35:6
**identified** 10:6 11:15
16:10 23:20 46:14
47:18
**identify** 15:13
**IDs** 26:12 35:20
**Illinois** 36:2,5,11 37:5
57:17
**immediately** 54:20 55:3
58:12 59:17
**implement** 30:4
**implemented** 30:16
42:4,11 58:6,21 59:12
67:18
**importance** 33:1
**important** 39:12 67:17
70:16
**Impose** 4:16 6:15
**in-law** 12:20
**inattention** 25:15,18
34:11
**include** 64:19
**included** 8:18
**includes** 71:11
**including** 37:14 57:7
**incomplete** 16:4
**incorrect** 17:1 32:18

33:5
**incorrectly** 15:1
**indicate** 13:22
**indicated** 14:17
**indicating** 14:14
**individual** 11:12
**industry** 1:19 4:7 6:6
8:13,16,16 17:13
20:15 21:12 31:10
**informal** 4:14
**information** 16:3 17:1,1
24:22 25:1,9,10 28:18
32:4 49:16 51:5 65:7
71:7 72:6
**initial** 19:21
**initially** 6:11 9:3
**ink** 60:1,3,5
**Innovation** 48:4
**Innovations** 49:1
**inspected** 38:14
**inspection** 7:10,12,14
7:19 9:1,12 17:17
18:14 19:21 20:1,10
20:13 21:4,8,10,13
22:12 23:8,12 27:6
41:6 44:2,4
**inspections** 32:14
57:16
**installed** 31:22
**instance** 11:12
**instances** 10:18 13:5
14:10 15:4 16:8
**insurance** 50:6
**insuring** 37:5
**intentional** 26:6 41:19
41:20
**interact** 24:3,6
**interacting** 23:14
**interference** 9:10 25:22
29:22 53:10 55:18
66:16
**internal** 31:15 42:3
43:15 57:4
**introduce** 5:10,22 6:12
**inventories** 57:14
**inventory** 7:16 18:17
35:21 43:16 44:2 45:9
45:10 46:6 49:8 50:7
54:3,5,12,12 55:1,4
69:6
**investigate** 40:17
**investigation** 8:16
**investigations** 70:21
**investigator** 6:7 8:11
8:14,17 11:7 17:13
20:16 21:13 34:3
55:17
**invoice** 58:13,15

**involved** 10:18 11:17
23:16 34:8,10 59:19
**involves** 13:4
**involving** 11:12 14:7
**IOI** 23:3 44:13 59:7
**issuance** 4:19
**issue** 11:15 13:9 14:9
24:4 25:14 31:7 52:21
**issued** 4:16 5:1
**issues** 5:2 10:6 13:11
16:10 57:17
**item** 12:1

**J**

**J-O-N-E-S** 40:22
**James** 63:10
**January** 17:14
**Jerry** 40:19
**jobs** 67:11
**Joe** 58:8
**John** 11:13,19 12:12,12
12:13,16,18 13:1
**Jones** 40:19,22
**jumped** 56:20
**Justice** 1:1,10 4:12

**K**

**keep** 63:15,18,18 66:18
67:1 68:18
**keeping** 57:6 69:4,6
72:7
**Kentucky** 1:15 4:6
**kept** 20:18 52:12 53:2
**keys** 52:19
**killed** 61:18
**kind** 24:18 33:8,22 37:6
39:19 40:3,4 43:2,4
43:12 57:19 58:4,9
62:19 65:11 66:4,22
68:1,7,9 69:13 72:13
**knew** 63:13
**know** 11:7,10 20:18
24:13,14,16,20,21
25:11 31:1,7,12 33:3
33:4 34:7,10,12 38:3
38:8 39:10 40:2,6
41:11,14,15,17 43:11
43:12 44:17 45:3
47:17 50:8,10 51:22
54:17 56:8,11,18 57:1
57:16 58:7,8,16 59:2
60:16 61:22 62:18
64:3,5,17,18,20 65:20
66:11,21 67:10,21
68:10,14,15,17,22,22
69:2,2,3,3,4,5,6,8,12
69:14 70:13,15,22
71:2

**knowledge** 23:17
**known** 42:11
**knows** 39:19,21 53:19
  70:14

**L**

**L-O-W-** 6:2
**lack** 18:12
**latest** 31:21
**Law** 8:18
**laws** 20:16,21 21:15
**layaways** 37:5
**LCP** 45:13 46:13
**lead** 6:6
**Leading** 39:22
**leads** 39:16
**learned** 66:12 67:14,14
**leave** 27:3 42:12,13
**leaves** 36:17
**left** 32:19
**legal** 18:18 49:20
**let's** 27:16 43:16 57:13
  61:5
**letter** 38:9
**letting** 61:13
**level** 60:12
**liable** 70:22
**license** 4:22 6:15 17:18
  18:20 21:1 26:13
  27:17,19 28:12,18,21
  32:9 68:19 69:8 71:12
  71:15,17
**licensee** 1:8 2:2 4:19
  5:9 6:17,20 7:10,12
  7:15,16,18,20 9:14
  12:3,4,6 14:1 15:13
  15:20 16:18,18 17:8
  20:8,17 21:14 73:7,8
**licensee's** 9:8,9,19
**licensees** 32:14
**life** 26:2 56:8 70:5
**likes** 26:3
**limb** 70:20
**limit** 65:18
**line** 40:13 65:6
**lined** 48:8
**link** 43:5
**list** 32:8 42:8 46:21 47:8
  54:2,7,7 58:3
**listed** 47:9
**listen** 51:17 59:21
**literally** 26:11 52:6 54:2
  64:10 66:15
**little** 22:2 23:10 24:19
  27:13 31:1,21 33:14
  42:1 45:12,13 56:20
  59:5 60:11 70:1
**livelihood** 62:21 63:4

**livelihoods** 69:3
**LLC** 48:8
**local** 39:19
**located** 4:5 11:19,21
**lock** 45:14
**locks** 45:19,19,20
**long** 25:21 27:19 49:11
  49:15 50:3 61:15
  70:10
**longer** 65:15,17
**look** 15:21 38:7 41:17
  45:12,13 46:20 61:4
**looked** 38:2 45:14 49:1
**looking** 29:20 38:8
  47:11 49:2 60:15
**looks** 39:21 48:2
**loose** 72:13
**lose** 67:11
**losing** 63:3 65:4
**loss** 18:10,11 19:17
**lot** 32:21 33:16 34:10
  34:19 35:8,22,22 36:1
  38:3,5 41:10,12 52:5
  52:18,20 54:1 55:17
  56:8 58:21 66:12,14
**Louisville** 1:20 2:8 4:8
  6:4
**love** 56:13
**low** 40:4,5
**Lowney** 2:7 5:20 6:2,2
  6:9,11 8:8,11,22 9:3
  9:17,22 10:4,17,22
  11:4 12:5,16,22 13:3
  14:5 15:2 16:6 17:3,7
  17:22 18:6 19:7,11,19
  20:14 21:2 22:19
  23:11,22 24:3 26:20
  27:5 30:9 34:2 37:22
  46:20 47:5,7,13,17
  51:18 66:6 68:11,12
  73:6
**luck** 45:10 46:4
**Lynn** 2:3 5:13 42:18

**M**

**M-** 5:13
**magnitude** 67:8
**maintaining** 20:22
  68:21 69:4
**majority** 52:4
**making** 60:18 66:13
  67:17
**man** 61:17 62:8
**marijuana** 40:6
**Mark** 2:7 3:5 6:2,5,8
  27:17 30:8 34:1,21
  37:19 38:6 55:2 56:7
  56:11 59:7,9 66:6

**Mark's** 38:8
**marked** 8:3 15:1 35:5
  54:8
**marketed** 31:3
**matter** 1:6,17 36:3
  73:11
**McCracken** 1:15 4:5
**McCUTCHEN** 2:3 5:13
  5:13 11:13,20 12:19
  13:1,1 18:21 19:2,8
  21:18 22:7,10,15,18
  22:22 23:5 25:21
  30:13,18 31:18 33:16
  39:10 41:3 45:17 46:5
  46:19 47:6 49:3,13
  50:6,13 55:2,7,13,16
  56:4,10 61:8,21 62:7
  62:16 64:7,22 65:3,9
  65:14,19 69:19
**mean** 23:8 31:14 50:2
  54:14 62:13 63:20
  64:17 66:12 72:20
**means** 15:17
**meetings** 61:12,12
**mentioned** 37:7 39:14
  43:16 44:14 60:19
  72:4
**mess** 26:10 30:20,22
  58:7,7,8 63:18
**messed** 34:14
**met** 23:9 66:13
**middle** 12:20 13:2
**Mike** 17:21
**million** 66:16
**mindful** 69:8
**mindfulness** 65:12
**minimally** 44:11
**minimum** 63:19
**missing** 44:10 54:5,10
  72:10
**misspells** 33:4
**mistaken** 13:20 24:7
**mistakes** 62:17 64:14
  69:22 70:3 71:2
**mister** 64:6
**mom-and-pop** 66:20
  67:5
**money** 30:1
**month** 41:4
**months** 44:3
**move** 35:22 36:5
**moving** 60:20,20 61:2
  67:17
**multiple** 35:7,11,12,15
  36:15 58:22

**N**

**N-E-Y** 6:3

**name** 4:6 5:11,11,22
  6:1 17:20 28:21 33:4
  36:7 48:17 63:6
**named** 11:13
**names** 62:14
**National** 11:18
**nature** 4:14 20:8
**necessarily** 39:13
  53:22 63:21
**necessary** 69:12
**need** 14:1,20 42:19
  43:3 57:11 58:7 65:13
  66:1 69:15,18 70:4
  71:7 72:22
**needed** 15:18 17:9
  44:22 59:20 63:13
**never** 25:7 36:13 41:16
  70:16
**new** 42:8,22 58:3
**NFA** 11:22
**NICS** 10:11,15 11:1
  16:8,20 23:15,21
  26:14 28:12 38:18
**night** 55:8,9
**nightmare** 48:17 53:9
**nine** 61:3
**nod** 5:7
**non-** 12:3
**Nos** 8:3
**note** 29:20
**notes** 8:9 10:1
**nother** 51:6
**notice** 1:18 4:15 6:14
  6:18 7:5,7 13:4 14:6
  15:4 16:7 34:1 57:1
  71:13,16,20 72:3
**November** 59:8
**novo** 72:1
**number** 6:20 10:9 16:19
  17:11 37:4 44:1,1,3,5
  44:8 55:20
**numbers** 43:22
**numerous** 61:9

**O**

**obviously** 34:14 62:22
**occasions** 18:2
**occurred** 21:8
**occurring** 24:17
**offer** 7:22
**office** 23:10
**officer** 4:9 41:1
**official** 21:16
**offline** 33:19
**Oh** 41:15 42:7 54:6 63:9
  65:2
**okay** 6:11 9:3,7,17
  10:17 12:22 13:3 19:7

19:11 25:13,16,20 26:20 27:14 28:3,6 29:2,11,14,18 30:7 35:12 37:4,6,11 38:13 39:1 40:7 42:10 44:20 45:2,5,16 46:4,11 47:13 49:4,9 50:18 51:2,9 53:20 59:15 65:2,8,11 68:6 72:12
**old** 23:9
**Omega** 48:8
**omission** 13:5
**omissions** 15:5
**on-the-job** 8:21
**ongoing** 53:6
**onsite** 17:16
**open** 73:10
**operate** 67:4
**operating** 20:22 33:10 57:15 58:3 66:18 67:6 67:15 72:6
**operations** 1:20 4:8 6:6 8:13,16 17:13 20:15 21:12
**opportunity** 9:14 56:21 57:20 66:7 68:7
**option** 69:22
**options** 69:17
**order** 15:20 26:10
**originally** 27:6
**overview** 20:21 21:14
**owner** 5:14

**P**

**P** 1:19
**P-R-O-C-E-E-D-I-N-G-S** 4:1
**packing** 58:15
**padlocked** 52:18
**Paducah** 1:7,15 2:4 4:6 5:14 9:1 12:21 20:5
**page** 10:13 47:5
**pages** 46:22
**paid** 29:22
**pains** 64:12 66:17
**Pam** 23:4
**pants** 67:1
**paper** 67:19
**paperwork** 48:13 65:5
**parking** 52:18,20
**part** 4:18 10:13 13:6,11 14:7,11 25:15,19 52:13 58:10 68:16
**particular** 13:11 14:9 14:12 16:11 68:20 69:10 70:2
**pass** 40:16,18
**passed** 63:8

**pause** 31:17
**pay** 26:5 39:13 57:11
**paying** 26:7 39:6
**peaked** 64:16
**pens** 60:1
**people** 33:12 40:5,10 41:10 48:12 49:15 50:9 60:15,15,18 61:3 64:2 68:20,21 71:1
**percent** 31:2
**perfect** 72:19
**permit** 10:19 11:1 25:5 27:7
**permits** 24:1
**person** 15:13 25:4 36:5 36:11 67:16
**picture** 40:16
**pin** 49:19
**pistol** 46:14
**place** 6:19 10:20 32:17 32:20 33:9 34:17 67:6
**places** 48:14
**play** 32:3
**played** 31:20
**please** 5:7,10,22 6:9 43:20 47:15
**point** 10:22 12:13 29:9 49:17 70:20
**point-of-** 29:7
**policy** 26:11 27:22
**pop** 53:5 63:7
**popped** 53:1
**pops** 27:2 31:16 53:17
**portion** 16:11
**position** 64:1
**potentially** 57:8
**preceding** 44:4
**present** 5:9
**presiding** 4:9
**pretty** 42:9 57:22
**prevent** 42:4
**price** 58:19
**prior** 10:19 22:12 23:1 39:15
**priority** 56:3
**probably** 30:2 35:1 40:11 51:13 59:13 61:16 70:9
**problem** 59:6
**problems** 27:15
**procedural** 5:2
**procedure** 33:10,11,13
**procedures** 34:16 42:8 57:15 58:4 66:19 67:6 67:15 72:6
**proceed** 6:8 27:2 29:10
**proceedings** 5:4
**process** 29:21

**produced** 15:19
**producing** 5:21
**prohibited** 14:4 40:7
**prohibiting** 13:22
**propaganda** 43:4
**properly** 37:1 69:1
**prove** 40:14
**provide** 9:14
**provided** 42:5 71:9 72:6
**provisions** 4:17 71:22
**public** 39:18 40:1
**pull** 35:13 36:7 37:22
**pulled** 25:12 52:15
**pulling** 25:1
**purchase** 40:14,15 41:9
**purchaser's** 28:17
**purchases** 40:9,10,12 40:13
**purposes** 16:15
**pursuant** 1:18
**purview** 11:18
**push** 40:8,13
**pushed** 27:12
**put** 26:12 27:6 28:21 29:5 32:6,6 33:9 36:20 42:15 43:14 47:20 51:18 52:17 58:19 59:20 65:6,7,17
**putting** 67:5,18

**Q**

**qualification** 7:9 17:12 17:15
**quarterly** 35:21 43:16 57:14
**question** 5:8 13:22 14:12,13,13 28:8 30:10 32:12 38:7 40:2 60:10
**questions** 11:7,11 13:15 33:15 34:3,4 56:13 66:5
**quick** 28:7 37:3,8 45:5 55:14 65:11 68:9
**quicker** 70:3

**R**

**rang** 36:18
**real** 37:3,8 55:14
**realize** 41:10
**really** 24:15 25:7,8 41:19 54:11 58:14 60:4 67:6 68:12 70:9
**reason** 31:17
**RECD** 3:5
**receipt** 42:22 72:3
**receive** 71:13,15,18,19
**received** 8:4 58:12

**receiving** 54:1
**recommendation** 31:4
**reconcile** 18:16
**reconciled** 18:4 54:12 54:20
**record** 5:4,6,12 6:1,13 6:21 7:4 8:1,7,10 11:14 17:19 35:2 38:10,14 40:21 41:6 42:16 43:14,19 44:9 47:21 51:19 57:3,6 64:1 68:14 71:11 72:7 72:11 73:9,10,12
**records** 7:1,6 23:7 51:1 68:21
**recover** 44:11
**RECROSS** 3:2
**red** 27:2 31:16
**REDIRECT** 3:2
**refer** 9:4 10:1,4 11:4 13:7 14:5 17:7 18:6
**reflects** 9:6,18 17:10
**regarding** 4:22 72:5
**regards** 10:6 13:10 15:5 16:6 18:8 56:22 72:9
**registry** 50:1
**regs** 38:15
**regular** 41:18 49:11
**regularly** 56:14
**regulation** 21:11
**regulations** 4:18 7:13 20:12,17,21 21:7,15 38:16 70:2
**related** 14:7
**relates** 11:8 15:3 16:8 23:12
**relationship** 56:16
**relatively** 52:14
**relevant** 72:11
**remember** 33:11 37:20 38:2 47:10 48:16 55:19 60:21
**reminded** 57:10
**remove** 63:22
**renew** 27:20
**repeated** 70:3
**repetitive** 62:21 63:1,2
**replacing** 62:1
**report** 7:9,14,20,21 9:8 17:12,15 18:9 19:18 21:9,15 46:9 65:7
**reported** 9:10 18:13 19:8 20:10 46:18 54:18
**reports** 7:17
**represent** 13:13
**representatives** 20:5
**reputations** 70:16

**request** 6:16 71:20 72:2
**requested** 4:20
**required** 11:2
**requirements** 20:19
**resolved** 57:9,18
**respond** 9:14 13:15,18
**response** 5:8 7:20 9:8
  9:19 13:16,18 14:2,22
**responses** 13:21 16:20
**responsible** 31:12
**restricted** 66:2
**result** 4:18 7:18
**retired** 25:22 39:15
**review** 4:15 69:2
**reviewed** 20:16 21:12
  44:5
**reviewing** 11:16 37:4
  62:13
**revocation** 7:8 10:1
  71:16
**Revoke** 4:15 6:14
**revoked** 4:22 71:13,15
**rid** 52:11 63:17 65:15
**rifle** 49:7
**right** 22:13,16 27:21
  29:15 31:16 33:21
  38:11 46:7 48:21 50:5
  51:7 54:13 55:2,12
  56:19 60:21,22 67:12
  68:5 70:6,11
**robberies** 56:2
**Rogers** 1:19 4:3,7 5:16
  5:19 6:8 8:6,9 17:19
  22:1,8,14,17 23:3,6
  24:9 28:7,11 29:2,6
  29:11,14,18 30:5,7,21
  31:19 33:18,22 35:2
  37:3,11,14,19 38:3,6
  38:13,20 39:1,9,14
  40:18,20 41:2,22
  42:10,18 43:2,7,11,19
  44:7,20 45:2,5,16,22
  46:4,8,11 47:3,14,19
  48:18 49:4,9,22 50:2
  50:10,18 51:2,7,15
  53:11,20 54:10,14,17
  54:21 55:19 56:9,15
  59:7,11,15 60:7,10
  61:2,20 62:3,12,17
  63:9,11,20 64:15 65:2
  65:8,11,16,21 67:12
  68:5 69:11 70:12 71:5
  72:13,19,22 73:7
**room** 39:8
**Roy** 2:3 5:13
**Ruger** 45:13 46:13,17
**Ruger's** 47:9
**ruled** 55:14

**rules** 20:21 21:15
**ruling** 31:7
**run** 26:12
**running** 27:17 72:15
**runs** 32:2

_____
**S**

**safe** 45:14,15
**safes** 45:18 52:13
**safety** 39:18 40:2
**sale** 29:8,10,12 58:19
**sales** 35:7,12 56:18
**sat** 22:1
**Saturday** 35:10
**save** 52:17
**saw** 37:16 63:7
**saying** 62:4,4
**scene** 55:8
**screen** 27:3
**SDR** 49:2
**seat** 67:1
**second** 11:5,11 44:17
  44:22 47:18
**seconds** 66:9
**section** 13:14 16:9
  71:22
**see** 32:4 41:8,20 43:13
  56:6 57:13
**seeing** 59:1,5,5 70:3
**seeking** 19:17
**seen** 60:4
**sell** 35:14 36:4 37:16
  43:8 45:18 51:4 61:4
  61:5 62:5,5 64:5 67:2
**selling** 57:12,13 61:5
  64:4 68:20
**send** 42:14 43:13 47:15
  49:19 72:4 73:1
**sent** 38:9 48:13
**September** 22:22
**serial** 16:19
**series** 6:22 13:13,14
  15:11 16:14
**set** 30:2 33:2 55:10
**shake** 5:7
**sheriff** 26:1 39:18
**shift** 58:11
**Shooters** 1:7 2:4 5:14
  9:1 12:21 20:5
**shore** 66:6,8
**short** 30:21 69:19
**should've** 35:11
**show** 12:1 18:18 26:17
  47:21
**showed** 34:13
**showing** 48:13 53:2
**side** 59:4
**sign** 36:12 37:16

**silencer** 49:3
**SilencerCo** 48:4,8
**silencers** 47:22 48:2,5
**similar** 55:21
**simply** 31:9
**Simultaneous** 19:13
  22:3,6 31:13 42:20
  43:9 46:1,16 47:16
  51:12 53:7
**sir** 5:16,19 13:12 16:13
  18:5 21:22 22:13
  30:13 43:18 44:7 55:5
  55:15 59:10
**Siren** 48:4
**sit** 54:6
**site** 15:4 23:13
**sitting** 45:15
**situation** 14:19 16:3
**six** 8:17 64:18
**sixth** 16:7
**skill** 62:5 64:2,4
**skirting** 70:18
**slip** 58:15
**slips** 37:1
**slowing** 39:7
**slows** 35:17
**smell** 40:6
**smoke** 52:5
**soft** 60:20 61:5
**software** 27:9
**sold** 31:5 50:7
**somebody** 12:16 36:16
  48:15 55:10 59:20
  62:1
**son** 12:20 13:2
**son-in-law's** 61:11
**sons** 61:10
**soon** 30:11 32:5 40:15
  58:10
**sorry** 5:20 6:9 8:9 17:21
  22:9,14 30:7 38:17
  72:9
**sort** 42:14
**sounds** 10:8 42:5 44:12
  51:19 56:15 57:9,17
**source** 15:15,19
**speak** 5:5 24:11
**speaking** 19:13 22:3,6
  24:14,17 31:3,13
  42:20 43:9 46:1,16
  47:16 51:12 53:7
**special-order** 36:9
**spell** 5:11 6:1
**spoke** 12:12 22:11
**stacked** 45:17
**standard** 4:4 33:10
  57:14
**standing** 72:5

**Star** 49:2 52:15
**started** 5:3 36:3 58:2
  59:17 66:22
**state** 33:5
**States** 1:1 4:12 72:1
**stay** 61:22 70:8
**staying** 61:22
**stole** 55:10
**stop** 14:1,20 34:18
  35:16 41:20 70:5
**stopped** 34:17
**stops** 32:17
**store** 36:17 38:10 41:4
  48:20
**stores** 62:10
**strategy** 67:5
**straw** 40:9,10,12,13,14
  40:15 41:9 56:18
**strength** 61:5
**struggle** 66:18
**stuff** 34:20,22 43:1,12
  46:2 51:4 52:12 58:21
  67:22 68:1 70:21
**submitted** 72:2
**Subpart** 4:18
**subsequent** 51:21
**suffered** 66:17
**Suite** 4:6
**Supply** 1:7 2:4 5:15 9:1
  12:21 20:5
**supposed** 48:20
**supposedly** 48:12
**sure** 8:15 20:17 31:6
  36:22 42:17 67:17
  68:19
**suspect** 41:21
**Suspend** 4:15 6:14
**suspended** 5:1
**suspension** 71:17
**suspicious** 56:19
**SVR** 52:15
**switch** 60:4
**switched** 60:1,5
**system** 26:22 29:8 31:2
  31:3,9 32:2,16 33:9
  35:11 36:4 57:6 72:8

_____
**T**

**tab** 36:5
**table** 22:2 23:10
**tabs** 63:18
**tactical** 48:3,22 60:14
**take** 6:13 32:1 39:7
  40:16
**takes** 58:18
**talk** 26:4 33:19 56:12,12
**talked** 12:12 42:1 44:10
  66:19

81

**talking** 24:19 25:18 26:4 28:11 32:18 61:18 64:2 67:7
**task** 40:22
**tasks** 69:10
**tell** 32:21 41:6,17 58:1
**telling** 36:10
**tend** 32:15
**term** 61:15
**terminate** 63:22
**terminating** 60:15 61:13
**termination** 60:19
**terms** 12:5 17:8 69:9
**texted** 44:18
**TFO** 56:16
**thank** 5:19 8:10 13:3 14:5 15:2 41:2,22 44:7 71:5
**Thanks** 17:21
**that'd** 72:17
**theft** 18:10
**theft/loss** 7:17
**thereabout** 59:9
**Thereabouts** 59:10
**thing** 53:2 58:1 64:7 70:1,7,14
**things** 32:21 33:7 39:20 59:18,22 60:16 69:7 70:8 72:16
**think** 22:4 25:11 26:6 33:8 34:11,16,17 40:14 41:11,14 44:14 44:16,17 48:9 52:6 57:8,16 59:6 63:1 66:11 67:13 68:10,10 68:16 69:15
**third** 13:4
**Thirteen** 8:8
**thorough** 69:5
**thoroughly** 69:1
**thought** 28:15 55:8 66:12 70:17,18
**thousands** 37:18
**three** 10:17 14:7,10 19:5 22:4 30:2,15 37:13,15 43:22 48:3 61:10 64:12
**Thursday** 1:13
**time** 4:3,4 5:5,8 6:19 10:16 18:22 25:5 27:12 35:9 36:17 41:21 56:12 62:2 65:12,17,22 66:3 67:14 69:12,17 70:10 73:8
**timeline** 59:12
**times** 36:15 61:14 63:1

**tiny** 23:10 45:12,13
**Title** 4:17 72:1
**Tobacco** 1:2 4:11
**today** 68:17 71:10
**today's** 6:19
**top** 37:20 48:16
**tornado** 50:14
**total** 44:1,2,5
**touch** 19:16 32:13
**trace** 72:9
**tracing** 46:9 47:12
**track** 48:22 50:22 51:11 69:4,6
**tracked** 49:5,17
**train** 65:10
**trained** 42:3
**training** 8:13,17,19,20 8:21 37:7 39:3 42:5 60:19 70:2
**transaction** 6:21 7:1,3 7:6 10:20 11:14 12:7 16:15,19 27:2
**transactions** 14:7 38:18
**transcript** 5:3
**transfer** 10:11,16 11:12 11:17,22 12:2 14:2,21 15:12,18,21 18:19 25:5 48:7,9,10 49:22 65:1
**transferee** 13:15,18,21 14:3,13,15,17 16:16 18:19
**transferred** 48:19 49:11 52:22
**transferring** 15:14 23:20
**transfers** 36:11 57:17 64:20
**tried** 52:10,16 63:14,18
**tries** 31:10
**troubleshooting** 24:18
**trust** 68:22
**try** 39:12 51:7 70:19
**trying** 24:12 31:22 43:7 48:7,22 49:6,16
**tumor** 63:12
**tumors** 63:16
**turn** 40:5,10 41:9
**turned** 19:5 40:11
**twice** 58:18
**two** 6:10 19:5 34:13 35:17 45:4 48:13 52:19 62:9 64:12
**type** 24:16,21 33:6

**U**

**Uh-huh** 30:6

**understand** 64:16,16 64:21 67:8 72:15
**understanding** 33:1
**unfortunately** 36:1
**United** 1:1 4:12 72:1
**unsure** 12:14
**update** 36:3 43:1
**updated** 28:17 42:11 57:5,5
**updates** 26:22
**upgrading** 29:21
**ups** 63:19
**upset** 48:11 71:1
**use** 57:12
**uses** 17:16

**V**

**v** 1:9
**valid** 25:5
**version** 31:21 57:6
**versus** 28:12 64:5
**violation** 9:8 10:2,2,18 11:11 13:4 14:6,9 15:4 16:7,12,14 18:2 21:9,16 23:15 44:8
**violations** 6:22 7:2,4,7 7:14,20,21 9:9,10,11 9:15,18,20 20:9,10 23:13,21 34:7 38:18 42:2 57:2
**vital** 69:7
**volume** 64:16 67:3

**W**

**waiting** 30:1 58:5
**walk** 11:9
**walks** 58:11
**Wall's** 50:16 53:4,13,13
**Wally** 50:16
**want** 14:15 28:8 31:7 34:1 46:20 47:14 50:3 56:20 65:17,18,22 66:1 70:10
**warning** 20:4,6
**wasn't** 24:15 25:8 26:7 53:16 67:3 68:3 71:3
**watch** 40:9 62:10 63:15
**way** 13:19 32:1 33:9 56:6 57:18 59:17 67:4 68:2 69:20 70:9,11
**we'll** 9:22 15:21 19:19 30:15 35:2,13,14 41:5 49:20 66:2 73:10
**we're** 28:1 29:22 30:1,2 35:12,20 43:1 48:7,21 49:1 58:10,22 59:3,5 59:5,17 64:11 66:20 66:21 67:3,5,8 68:9

69:14 70:6
**we've** 19:5,8 29:22 34:16,17 38:14 39:11 42:7 58:13,21 60:4 64:13,20 66:1,11,14 66:17,19 67:14 70:7
**week** 42:14 72:20
**weekend** 72:18
**weekly** 41:9
**weeks** 8:18 30:3,15 57:7 72:14
**welcome** 34:5
**weld** 49:19
**went** 12:11 35:19 38:15 39:4 45:6 48:19 50:8 51:5 53:3 54:3 66:16 73:12
**weren't** 54:8
**whatsoever** 26:7
**wife** 61:10
**wild** 50:21
**wind** 70:22
**WITNESS** 3:2
**women** 41:12
**word** 65:21
**words** 57:12
**work** 31:4,10 58:18
**worked** 26:2 58:9 62:8
**working** 36:3 58:3
**works** 12:20 56:17
**worth** 63:3
**would've** 15:18
**Wow** 45:21
**writes** 33:5
**writing** 4:20 71:13
**written** 6:16,18
**wrong** 8:10 32:4 39:17 70:9,17

**X**

**Y**

**yeah** 12:19 22:4,14,19 23:2,3,6 24:9 25:6 29:19 30:7,9,14 31:14 33:16 34:1,2 37:4,14 37:19 38:6 39:22 41:2 41:22 42:7,21 43:2 45:22 46:4,7,12,18 47:4,7,14,17,22 50:2 51:10,15,16 54:14,16 54:21 56:15,19 60:7 61:2,20 62:3 63:20,20 64:6 65:8,21 68:12 72:22
**year** 8:21 37:16 53:1,1
**years** 8:17 26:2,3 41:5 62:9 64:12,17 65:4

Neal R. Gross and Co., Inc.
Washington DC
(202) 234-4433
www.nealrgross.com

66:22 70:6,8
**yep** 31:18 47:3,3 63:11
**you-all** 11:10 51:17 55:16 56:6 68:14 69:17

**Z**

**0**

**1**

**1** 3:9 6:14 35:3,5 47:2
**1-13** 3:7 8:4
**1,792** 44:2
**10** 7:10 8:18 15:4 19:22 20:3 37:4,10,15
**10:02** 1:18 4:2,3
**100** 31:1
**102** 4:6
**11** 7:12 13:4 21:3,6
**11:06** 65:12
**11:14** 73:8,12
**12** 7:15 8:6 18:2,7,9,14 18:21 44:3,10 54:15
**12-02** 6:15
**13** 7:19 8:9,10 9:4,7
**14** 6:17 26:3
**15** 22:7,10,15
**1600** 1:15 4:5
**17** 22:22
**18** 72:1
**19** 64:10

**2**

**2** 6:16
**2,000** 54:2
**20** 16:7 66:22
**2000** 20:13 64:10
**2010** 17:14
**2015** 7:11 20:1,13 22:1 23:3 66:13,14
**2017** 7:14 21:3,8,10 22:12,20
**2020** 64:10
**2021** 11:13
**2022** 6:16,18
**2023** 1:14 4:5
**21** 14:7,11 32:7
**21A** 14:12
**22** 22:20
**23** 1:14 4:4
**24** 72:21
**26A** 16:2
**27** 4:17
**27A** 16:21
**27D** 16:22
**28th** 17:14

**3**

**3** 6:18 10:13 52:12
**3,000** 37:17
**30** 29:22 66:9
**35** 3:9
**36** 48:9

**4**

**4** 6:20 10:5,8,9 11:13,19 11:21
**4,500** 64:19
**4,689** 44:6
**4.5** 66:16
**40** 41:5 70:6,8
**4473** 6:21 7:1,3 11:20 12:1,8 15:15 24:14 29:7 32:16 36:12 39:7 40:16 58:5,22 63:22 65:1
**4473s** 10:10 13:13,14 15:11 16:15 30:16 32:3,15 36:15 44:5 57:2 60:2 62:14 64:19
**4500(5300.4)** 4:16
**4550** 4:19
**478** 4:18

**5**

**5** 6:22 13:7,12

**6**

**6** 7:3 16:12,14
**6,000** 64:18
**6,110** 44:4
**60** 72:3

**7**

**7** 7:5 15:3,10 18:2 44:9

**8**

**8** 3:7,7 7:5 16:14
**800** 54:5

**9**

**9** 7:8 17:9,11 37:10,14
**923F3** 71:22

83

C E R T I F I C A T E

This is to certify that the foregoing transcript

In the matter of: Paducah Shooters Supply

Before: US ATF

Date: 02-23-23

Place: teleconference

was duly recorded and accurately transcribed under my direction; further, that said transcript is a true and accurate complete record of the proceedings.

_____
Court Reporter

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1716 14TH ST., N.W., STE. 200
(202) 234-4433          WASHINGTON, D.C.  20009-7831          www.nealrgross.com