## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## PADUCAH DIVISION

**PADUCAH SHOOTERS SUPPLY, INC.**                              **PETITIONER**

v.                                                                                        No. 5:23-cv-88-BJB

**ADAM P. ROGERS,** *in his official*                          **RESPONDENT**
*capacity as Acting Director of*
*Industry Operations, Louisville*
*Field Division, Bureau of Alcohol,*
*Tobacco, Firearms, and Explosives*

### OPINION & ORDER

      In the firearms business, as in other heavily regulated areas, "[m]en must turn square corners when they deal with the Government." *Rock Island, Ark. & La. R.R. Co. v. United States*, 254 U.S. 141, 143 (1920). Congress has enacted a scheme of record-keeping rules under the Gun Control Act that governs the sale and transport of firearms and restricts who can buy guns from federal firearms dealers. *See* 18 U.S.C. §§ 921–28. Under these laws, the Bureau of Alcohol, Tobacco, Firearms, and Explosives has established rules requiring dealers to "maintain … records of importation, production, shipment, receipt, sale, or other disposition of firearms." § 923(g). And the risk of noncompliance is tremendous. The Act (codified in the U.S. criminal code)—criminalizes some violations, *see* 18 U.S.C. § 924, and authorizes the ATF to revoke a federal firearms license for a *single* violation of these regulations—so long as the violation is "willful," § 923(e). This combination of robust congressional delegation and enforcement discretion places great importance on the meaning of "willfulness."

      That's the question raised by this preliminary-injunction motion. The ATF has revoked the federal firearm license of Paducah Shooters Supply, Inc.—the fourth largest gun dealer in Kentucky—based on record-keeping violations discovered in 2022. Without a license, Shooters Supply won't be able to lawfully sell guns. *See* §§ 922(a)(1), 923(a). Any "future sales" by a revoked license holder, as the ATF told Shooters Supply, would "be evaluated for a potential violation … just as would occur with a person who had never been licensed." ATF Final Notice of Revocation (DN 1-1) at 10.

But "[i]f men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them," too. *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1486 (2021). The same statute that authorizes the ATF to issue and revoke firearm licenses likewise authorizes licensees to challenge those decisions in court: § 923(f)(3) authorizes "de novo" review in federal district court of decisions to deny or revoke a license. Shooters Supply has availed itself of this right, challenging the acting (Louisville) field office director's determination that its violations were willful rather than merely negligent.

At least at this preliminary stage of the proceedings, Shooters Supply has the better of the argument. The revocation order rests on the crucial but conclusory finding that each time Shooters Supply violated a regulation it did so willfully. *See* ATF Final Notice at 4–7. "Willfulness" requires "intentional, knowing, or reckless disregard" for the rules. *Armalite, Inc. v. Lambert*, 544 F.3d 644, 647 (6th Cir. 2008). Yet nothing in the record indicates Shooters Supply didn't just violate the regulations, but didn't even *care* whether it violated them. To the contrary, the record before the Court—which mirrors the record before the agency—indicates the store has attempted to correct process failures, cooperated with law enforcement, taken disciplinary action against rule-breakers, and adopted software and process changes meant to improve compliance. All of this suggests mistakes (potentially grave ones, to be sure) rather than intentional violations. Indeed, the Government volunteered that it doesn't "think that there was a bad actor here." July 6 Telephonic Hearing (DN 17).

Because Shooters Supply has shown a strong likelihood of success, a risk of irreparable injury, and the balance of equities tilting in its favor, the Court must preserve the status quo during this lawsuit by preliminarily enjoining the Government's license revocation.

*\*\*\**

**A. Inspections.** Shooters Supply is a family-owned business that has sold guns in Kentucky for around forty years. Petition for Review (DN 1) ¶ 8; ATF Hearing Transcript (DN 11-4) at 64:9–10. What started as a mom-and-pop shop has grown rapidly during the last five years. ATF Hearing Transcript at 64:9–21, 66:20. In 2022, Shooters Supply apparently sold more than 6,000 guns. *Id.* at 44:1–6.

Before that growth, a 2015 ATF inspection showed the store had failed to fill out transaction records on "numerous" occasions, failed to properly record National Instant Criminal Background Check System ("NICS") information in some cases, and failed to account for all the firearms in its inventory system. ATF Final Notice at 9; 2015 Response to Violation Report (DN 11-1). At that time, Shooters Supply promised to take corrective actions and the ATF documented these steps in a "Report of Violations," a form of disciplinary action short of revocation. 2015 Report of

Violations (DN 11-5). In 2017, the ATF again found that Shooters Supply had violated the record-keeping provisions of §§ 922–23—albeit in a smaller number of cases—and the agency again issued a Report of Violations. ATF Hearing Transcript at 21:6–17, 22:18–21; PI Hearing Transcript (DN 20) at 24:17–25; 2017 Acknowledgement of Regulations (DN 11-13).[1]

The ATF's 2022 inspection of Shooters Supply went much differently than those conducted in 2015 and 2017. During calendar year 2022, Shooters Supply sold 6,110 guns. ATF Hearing Transcript at 44:1–6. But an ATF inspection in July of that year uncovered several errors that violated regulatory record-keeping requirements. Petition for Review ¶ 9. Most involved ATF Form 4473, which is the firearms transaction record required of a licensee and buyer; another category of violations involved the store's failure to properly track its inventory. All told, the ATF identified a total of 60 violations of 7 regulations over a period of about a year—between mid-2021 to mid-2022:

- Transferring a firearm to an unlicensed person without performing a NICS background check and waiting three days.[2]

- Selling or disposing of a firearm to an unlicensed person without recording the transaction.[3]

---

[1] In 2021, the Government announced a new "zero tolerance" approach to violations of federal gun-control regulations, including some of the record-keeping requirements at issue in this case. *See* Lauder Memorandum (DN 15-2) (citing Comprehensive Strategy to Prevent and Respond to Gun Crime and Ensure Public Safety (June 23, 2021), available at https://www.whitehouse.gov/briefing-room/statements-releases/2021/06/23/fact-sheet-biden-harris-administration-announces-comprehensive-strategy-to-prevent-and-respond-to-gun-crime-and-ensure-public-safety/). Under this policy, the ATF announced it would revoke licenses whenever a licensee willfully sold a gun to someone prohibited from owning one, failed to conduct a background check, falsified a firearm transaction form, didn't respond to an ATF tracing request, or refused to allow an ATF inspection. *Id.* at 3. Even for a single violation, less severe sanctions became unavailable to agents absent "extraordinary circumstances." *Id.* at 1.

Revocation is the most serious regulatory sanction available to the agency: available intermediate steps include a violation report and a warning conference giving the licensee a chance to change course, as occurred with Shooters Supply in 2015. *See* 2014 ATF Fact Sheet, https://www.atf.gov/file/11136/download (describing possible sanctions for violations of the Act and ATF regulations, including fines, suspension, revocation, and imprisonment).

[2] The ATF identified 3 violations of 18 U.S.C. § 922(t), as implemented at 27 C.F.R. §§ 478.102(a) & (d)(1).

[3] 1 violation of § 922(m) & (b)(5); 27 C.F.R. § 478.124(a).

- Failing to obtain a complete or accurate ATF Form 4473 from the transferee.[4]
- Failing to obtain or execute ATF Form 4473.[5]
- Transferring a firearm without verifying the identity of the transferee or noting the type of identification on ATF Form 4473.[6]
- Failing to record the date when it contacted NICS of the response or identification number provided.[7]
- Failing to timely or accurately record the disposition of firearms.[8]

*See* Notice to Revoke (DN 11-2) at 4–5. Shooters Supply offered the ATF an explanation for each violation, characterizing them as unintentional mistakes. DN 11-1.

**B. Revocation.** The ATF disagreed, deeming each of these violations willful. It then filed a notice to revoke Shooters Supply's license. *Id.* Shooters Supply didn't (and still doesn't) contest that these violations happened. Petition for Review ¶ 14. But it contends they weren't willful, *id.*, and demanded an administrative hearing to prove as much, ATF Final Notice at 1, 3.

Acting Director Rogers presided over the hearing. The ATF presented the testimony of a single individual: Agent Mark Doran. Doran identified the violations and explained how he uncovered them. ATF Hearing Transcript at 9–18. He also addressed the 2015 and 2017 violations. *Id.* at 20:3–13, 21:6–17. Doran did not otherwise testify about Shooters Supply's intent.

In response, owner Roy Lynn McCutchen and manager Chance Clanahan testified at length regarding the circumstances of the violations. Introducing and expanding on the store's earlier responses to Agent Doran, *see* DN 11-1, the two witnesses explained that the violations generally resulted from "inattention," "getting busy," and "computer glitches." *Id.* at 34:10–12. Their software, since replaced, was old, glitchy, and difficult—causing significant record-keeping issues. *See id.* at 34:9–37:8. They also attributed the vast majority of errors to a single employee. Danny Horn reportedly had a tendency to "ge[t] excited about talking about hunting or guns or whatever and [not] pay any attention" to the task at hand. *Id.* at 26:3–8. Shooters Supply has since reassigned Horn, who is apparently no longer in a role where he

---

[4] 11 violations of § 923(g)(1)(A); 27 C.F.R. § 478.124(c)(1).

[5] 3 violations of § 922(m); 27 C.F.R. § 478.21(a).

[6] 10 violations of § 923(g)(1)(A); 27 C.F.R. § 478.124(c)(3)(i).

[7] 20 violations of § 923(g)(1)(A); 27 C.F.R. § 478.124(c)(3)(iv).

[8] 12 violations of § 923(g)(1)(A); 27 C.F.R. § 478.123.

could run afoul of ATF rules. PI Hearing Transcript at 21:7–13. McCutchen and Clanahan went on to discuss their significant history of cooperation with the ATF, ATF Hearing Transcript at 39–41, efforts to track down lost inventory, *id.* at 45–49, inventory challenges caused by a major fire at the store, *id.* at 51–55, and recent improvements to their policies and practices, *id.* at 26:9–19, 26:21–30:20, 35:7–37:2.

Agent Doran himself corroborated much of this testimony. He stated that only "one employee"—Horn—was associated with violations of the NICS background-check recording rules. *Id.* at 23:17–21.[9] And he agreed that Shooters Supply's inventory software mishandled some inter-store transfers after the fire: "the computer," he said, was "a nightmare." *Id.* at 53:8–10. At the preliminary-injunction hearing, moreover, counsel for the ATF agreed with McCutchen and Clanahan that the store has "taken steps after the revocation hearing" to address the safety and adequacy of its record-keeping processes. PI Hearing Transcript at 21:7–13.

After the hearing, acting director Rogers issued a short order stating that he'd decided to revoke Shooters Supply's firearms license. That order didn't offer much in the way of reasoning, however. Citing (without further specifics) "the entirety of the administrative record," Rogers concluded "that this violation was willfully committed, that Licensee's explanation for this violation is not persuasive as to whether the violations were committed willfully," and that "this violation is grounds for revocation." ATF Final Notice at 4–7. The order didn't appear to consider (or at least did not explain, which in administrative law is more or less the same thing, *see SEC v. Chenery Corp.*, 318 U.S. 80, 94–95 (1943)) whether any violation might have been merely negligent—or how the ATF could've told the difference. This wouldn't suffice under deferential arbitrary-and-capricious review, much less the de novo review Congress called for here. *Cf. LeMoyne-Owen Coll. v. NLRB*, 357 F.3d 55, 61 (D.C. Cir. 2004) ("The NLRB may have an adequate explanation for the result it reached in this case. We cannot, however, assume that such an explanation exists until we see it."). Nor did the order identify the person or persons at Shooters Supply who purportedly knew the rules yet decided to skirt them.

The revocation order offered only two factual references for its willfulness conclusion. First, it concluded that "licensee was educated" about the relevant requirements "in 2011, 2015, and 2017 and cited for this violation in 2015." ATF Final Notice at 3–6. Second, the order repeatedly made bare references to the "entirety of the administrative record." *Id.* at 3–8. But it doesn't indicate which (if any) portions of the record Rogers viewed as indicating willfulness. As for the evidence cutting *against* willfulness, the order acknowledged Shooters Supply's explanation that the actions were due to inattentiveness, not due to disregard for the

---

[9] Horn was apparently one of approximately ten employees in the gun department. ATF Transcript at 37:9–10.

5

law. But the agency—again for reasons not explained in the order—found them "not persuasive." *Id.* at 4–6.

Shooters Supply then filed a motion to reconsider with the agency, *see* § 923(f)(2), which the ATF denied.

**C. Litigation.** This lawsuit challenges the ATF's willfulness determination, requests a de novo hearing, and seeks a preliminary injunction preventing the ATF from revoking its license. § 923(f)(3). Pending adjudication of the petition for review, the ATF has stayed its revocation order until August 11, 2023; Shooters Supply has sought a preliminary injunction to extend that stay through the remainder of its appeal. Petition for Review ¶¶ 55–60.

The Gun Control Act provides that "the Attorney General may, after notice and opportunity for hearing, revoke any license issued under this section if the holder of such license has *willfully* violated any provision of this chapter or any rule or regulation prescribed by the Attorney General under this chapter." § 923(e) (emphasis added). If the agency (exercising delegated authority) revokes a license, then "the aggrieved party may at any time within sixty days … file a petition with the United States district court … for a de novo judicial review of such denial or revocation." § 923(f)(3).

This is such a de novo proceeding. It asks whether the acting director was "authorized" by the statute "to deny the application or to revoke the license." *Id.* The Court "may consider any evidence submitted by the parties to the proceeding whether or not such evidence was considered at the hearing held" by the ATF. *Id.*

The Court reviews the willfulness determination de novo—that is, without any deference to the agency's determination beyond its persuasive weight. *See Fairmont Cash Management, LLC v. James*, 858 F.3d 356, 361 (5th Cir. 2017); *Stein's, Inc. v. Blumenthal*, 649 F.2d 463, 466–67 (7th Cir. 1980). If a violation was willful, then a court's grounds for reviewing the ATF's choice of remedy are limited; all that Congress required for revocation is a single "authorized" violation. § 923(e); *see also Stein's, Inc.*, 649 F.2d at 464 n.2.[10] For its part, the Government would boldly extend this deference even further—from the choice of a remedy to the establishment of a violation. It argues that "[t]he Court should not step into ATF's shoes, examine the evidence, and make its own decision whether the [Act] was violated." Response to Petition (DN 11) at 2. Counsel never explains, however, how to square that position with the statute's express call for "de novo judicial review" based on evidence

---

[10] The Sixth Circuit has noted "uncertainty" or tension between the statute's call for "de novo judicial review" and its limitation of review to whether the revocation is "authorized," but explicitly left any analysis of the standard of review "for a later date." *Procaccio v. Lambert*, 233 F. App'x 554, 556–57 (6th Cir. 2007).

"submitted by the parties … whether or not such evidence was considered" at the ATF hearing. § 923(f)(3). That approach appears irreconcilable with the statute. Surely Congress intended courts to offer independent judgment, not complete deference. *See, e.g.*, *Fairmont*, 858 F.3d at 361–62. And the ATF must justify its determinations that Shooters Supply willfully violated the Act. *See CEW Properties, Inc. v. U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 979 F.3d 1271, 1278 (10th Cir. 2020) (discussing the ATF's burden to establish a willful violation in a license-revocation proceeding).

As to the preliminary-injunction request, the licensee naturally bears the burden of establishing its entitlement under the familiar four-factor test. *See, e.g., Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). Here Shooters Supply has carried its burden with respect to all four factors and established, on this preliminary record, that the ATF lacked a reasoned evidentiary basis for revoking the license.

**1.** The first and most important of the four preliminary-injunction question is, of course, likelihood of success on the merits. *O'Toole v. O'Connor*, 802 F.3d 783, 792 (6th Cir. 2015). Neither party introduced evidence at the preliminary-injunction hearing (though they agreed on many important factual points), so the Court is left to assess the record assembled before the ATF and the findings of willfulness described in its revocation order.[11]

What makes a violation willful? The Sixth Circuit has explained that a licensee willfully violates the Gun Control Act "when, with knowledge of what the law requires, it intentionally or knowingly violates the [Act's] requirements or acts with plain indifference to them (i.e. recklessly violates them)." *Armalite*, 544 F.3d at 647. The statutory violation must be "deliberate, knowing or reckless," not negligent. *Id.* at 648–49.

In its papers, its earlier decision, and its argument before this Court, the Government relies primarily on the fact that "Shooter's Supply was warned in 2015 that its noncompliance with the GCA could result in revocation," pledged to take corrective steps, and then "committed many of the same violations" in 2022. Response to Petition at 16; *see also* ATF Final Notice at 4–7. True, "knowledge of what the law requires" is part of the analysis. *Armalite*, 544 F.3d at 647. But only

---

[11] Shooters Supply also argues that the decision to rescind its license violated the Constitution's Second Amendment and the Excessive Fines Clause. Petition for Review (DN 1) ¶¶ 39–54. But counsel admitted at the preliminary-injunction hearing that these arguments weren't yet fully developed. And "[w]here a statutory or nonconstitutional basis exists for reaching a decision, as it does here, it is not necessary to reach the constitutional issue." *Adams v. City of Battle Creek*, 250 F.3d 980, 986 (6th Cir. 2001).

7

part. The evidence supporting a "intentional" violation or "plain indifference" to the law remains unclear in this record. *Id*.

When pressed to identify the record material that supports a finding of willfulness, counsel for the Government pointed to: (1) a document listing Shooters Supply's responses to the 2022 violations, *see* DN 11-1 and PI Hearing Transcript at 6:2–7:23; and (2) the 2015 warning conference letter (DN 11-6), which documents that the store committed many of the same violations earlier, *see* DN 11-6 and PI Hearing Transcript at 10:2–16. The Government provided no other specific evidence of willfulness, instead relying on the notion that it "can be established more simply on the basis that you acknowledge that you were aware of [Form] 4473, the regulations surrounding those, the requirements surrounding those, and you didn't comply." *Id.* at 16:18–23. This is consistent with the ATF's presentation at its revocation hearing, where its only evidence consisted of documents and testimony showing that Shooters Supply committed the same violations in 2015 and 2022. *See* § B above.

Remarkably, the first document that the ATF cited at the hearing—Shooters Supply's "Response to Violations Report"— is a summary of *exculpatory* information offered in response to the ATF's initial notice. This document includes the store's mitigating explanations for each violation and the steps it has taken to comply with the law going forward. DN 11-1 at 2–4. The only inculpatory evidence this document lent the Government's case was the mere fact of violations—which here say next to nothing about whether those violations were willful or negligent. And given the extensive response to each violation, the document hardly shows that Shooters Supply "simply does not care about the legal requirements." *RSM, Inc. v. Herbert*, 466 F.3d 316, 322 (4th Cir. 2006). The second document, moreover, is principally historical and doesn't connect past knowledge with present violations or employees.

Shooters Supply, by contrast, offered this Court substantial affirmative evidence in support of its negligence defense. Both the ATF and the store witnesses at the agency hearing agreed that all background-check recording violations (the vast majority of the breaches alleged) were committed by a single employee who apparently failed to complete the relevant forms at least partly because he became too engaged in conversation with customers. ATF Hearing Transcript at 23:17–21, 26:3–8.[12] Shooters Supply has since reassigned that employee. And there's no evidence that the employee acted willfully or that the store was aware of his errors and chose to do nothing in response. PI Hearing Transcript at 21:7–13. Further

---

[12] As to the three omitted background checks, Shooters Supply apparently did not conduct them because an employee relied on a NICS exemption form—but a form that had expired. Licensee Response to Violations Report (DN 11-1) at 2. In each case, the individual who received the firearm without a background check apparently was later confirmed not to be someone prohibited from possessing a gun. *Id*.

8

testimony suggested that inventory failures were caused, at least in part, by difficulties with how its software handled transfers. *See* ATF Hearing Transcript at 35:7–36:14; *id.* at 51–55 (discussing problems with software's handling of "multiple sales," sales to Illinois buyers, and other in-depth challenges). These problems were apparently exacerbated by a fire at the store, which caused the relocation of inventory. *Id.* at 51:18–54:9. The software apparently struggled with the inventory transfers to other stores after the fire. *Id.* at 52:9–53:6.

Again, the ATF's own agent corroborated that the inventory software was a "nightmare" for processing inter-store transfers after the fire. *Id.* at 53:8–10. Clanahan also testified to his extensive efforts to track down unrecorded inventory in the fire's aftermath, using hand-written lists to reconcile issues with the computer registry, *id.* at 54:1–9, searching the physical inventory for specific items, *id.* at 45:7–15, and working with the insurer to account for inventory sold in bulk to another retailer, *id.* at 49:5–50:17. Finally, Clanahan and McCutchen testified to the store's other efforts to cooperate with the ATF in the enforcement of firearms laws, *id.* at 40:8:17, 56:4–19, for which the hearing officer noted their "concer[n] with public safety," *id.* at 39:17–18, 40:1.

The ATF points to no evidence suggesting these explanations are not credible. To the contrary, before this Court it affirmed its view that "we don't believe that [the owners and operators of Shooters Supply] are bad people," just that they "had some bad habits." PI Hearing Transcript at 32:19–20. At an earlier hearing, counsel explained that the Government doesn't "think that there was a bad actor here" or that anyone was "intentionally" trying to violate the law. July 6 Telephonic Hearing (DN 17).

Instead the Government attempts to overcome evidence of good faith and establish willfulness by pointing to the fact of violations, both past and present. To be sure, repeated violations may give rise to an inference that the licensee deliberately, knowingly, or recklessly violated the law: "at some point, repeated negligence becomes recklessness." *Armalite*, 544 F.3d at 650 (*citing RSM*, 466 F.3d at 322). The Government perceives in these precedents the proposition that it can or even has established willfulness *as a matter of law* based on prior violations. July 6 Telephonic Hearing (DN 17) (describing lack of "factual dispute" because of the legal definition of willfulness). That is wrong for at least two reasons.

First, willfulness is plainly a question of fact, not law. *See, e.g., Armalite*, 544 F.3d at 649 (discussing "willfulness" on summary judgment as a fact question and analyzing the specific record in the case to find that violation was willful). Even if at some point a one-sided factual record establishes a point as a matter of law, *see* FED. R. CIV. P. 56, the Government hasn't come close to making such a showing here.

Second, the caselaw cited by the Government doesn't discuss any automatic establishment of intent based on previous violations. Those are *relevant* to the willfulness determination; their repetition may allow a fact-finder to infer reckless disregard for the law. But *may* does not mean *must*. "A single, or even a few, inadvertent errors may not amount to 'willful failures', even when the legal requirement to complete the forms was known." *RSM*, 466 F.3d at 322. To give rise to an inference of recklessness, "such errors" must "continue or even increase in the face of repeated warnings … accompanied by explanations of the severity" such that "one may infer … that the licensee simply does not care about the regulatory requirements." *Id.* And even then, an inference is subject to rebuttal based on other evidence in the record.

The record at this stage does not support an inference that Shooters Supply deliberately, knowingly, or recklessly violated the Gun Control Act. While it's true that the store violated the law on multiple occasions in 2015, 2017, and 2022, those violations are spread over a seven-year period, straddle a period of high growth, and involve a small number of errors relative to the annual volume of sales.[13] Sixty violations across a few hundred sales in a few months might give rise to a very strong inference of willfulness; the same number across thousands of sales in a year implies much less. *See, e.g., Garner v. Lambert*, 345 F. App'x 66, 72–73 (6th Cir. 2009); *RSM*, 466 F.3d at 322.

"[W]e are not dealing with bubble gum," the Government notes. PI Hearing Transcript at 12:7. True enough. Nor are we dealing with evidence that McCutchen and Clanahan operated in the cavalier style of a Willy Wonka. Record-keeping regulations are undoubtedly important to the enforcement of federal firearm laws. Yet this Court and the ATF must follow those statutes every bit as much as Shooters Supply. And here the record does not support an inference that Shooters Supply "simply does not care about the regulatory requirements," *RSM*, 466 F.3d at 322, or otherwise deliberately, knowingly, or recklessly violated them. *See Armalite*, 544 F.3d at 647. Based on the record before the court, Shooters Supply has shown its negligence defense is likely to prevail.

**2.** Shooters Supply easily shows that it'll suffer irreparable harm absent a preliminary injunction. If the revocation order takes effect, Shooters Supply may no longer lawfully sell guns. *See* § 923(a). This will cost it not only sales, but also goodwill critical to the value of a going concern. Petition for Review ¶ 56. This much

---

[13] While only a single willful violation is required to justify revocation, the volume of violations is still relevant to whether it is appropriate to draw an inference that violations were willful rather than negligent.

is obvious and undisputed: Shooters Supply derives 75% of its revenue from the sale of firearms, PI Hearing Transcript at 33:10–12.

The ATF concedes that "there could be significant harm," but argues that "money is typically not considered irreparable harm." *Id.* at 31:19–21. That's true in an ordinary civil suit, *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992), which this of course is not. Sovereign immunity presumptively protects the Government from liability for the economic harm its regulations and enforcement, even if erroneous, cause a litigant. So the loss of irrecoverable profits does qualify as irreparable harm. *See, e.g., Kentucky v. United States ex rel. Hagel*, 759 F.3d 588, 599–600 (6th Cir. 2014).

**3.** Nor does the record show that a preliminary injunction would "cause substantial harm to others." *Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 554 (6th Cir. 2021) (quotations omitted). In its papers, the Government argues that a preliminary injunction would cause "public harm outweigh[ing] any harm to Shooters Supply" because "ATF and other law enforcement agencies rely on accurate transaction records" and "these violations make it harder for ATF to carry out its mission of reducing violent crime and protecting the public." Response to Petition at 17–18. This is beside the point: the Government hasn't argued that Shooters Supply is currently violating the law. And in any case, these arguments don't explain why a *preliminary* injunction would harm any third parties; a final judgment in favor of the ATF after an injunction would fully vindicate these regulatory objectives—just somewhat later, after the ATF has pointed to adequate record support for its determination.

Perhaps recognizing the weakness of these contentions, the Government walked back its argument at the hearing. This prong is not "of great significance in this matter," it noted, pointing instead to the general risk that an "error on a [Form] 4473" could lead to "somebody" who shouldn't have a gun walking out with one. PI Hearing Transcript at 32:21–33:8. But the Government also conceded that Shooters Supply has "taken steps after the revocation hearing" to improve its practices. *Id.* at 33:7–8. And the record does in fact show that Shooters Supply has taken action to bring its operation into compliance with the relevant firearms regulations. *See* ATF Hearing Transcript at 26–30, 35–38, 41, 56–60. In response to the Court's questions, moreover, the Government acknowledged it knew of no risk of violence or criminal activity that Shooters Supply's ongoing activity would create. PI Hearing Transcript at 32:21–33:9. Given that the current record indicates Shooters Supply has addressed any ongoing safety risks, a preliminary injunction would not risk substantial harm to third parties that outweighs the harm of license revocation to the store.

**4.** Finally, when the Government opposes a preliminary injunction, the public interest "merge[s]" with the assessment of the harm to the party opposing the

11

injunction. *Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Here, largely for the reasons stated above, the Government's interest does not outweigh Shooters Supply's interest in an injunction. And given the likelihood that Shooters Supply will prevail on the merits, the public interest also favors an injunction to vindicate the rights not only of the store, but also its customers and employees, under the law. *Cf. G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994).

## PRELIMINARY INJUNCTION

The Court:

1. Grants Paducah Shooters Supply, Inc.'s Motion for a Preliminary Injunction (DN 1);

2. Enjoins Acting Director Adam P. Rogers from revoking the Federal Firearms License of Paducah Shooters Supply while this case remains pending;

3. Orders Paducah Shooters Supply to post a bond of $1000 to secure the preliminary injunction, *see* Fed. R. Civ. P. 65(c); *Appalachian Regional Healthcare, Inc. v. Coventry Health & Life Ins. Co.*, 714 F.3d 424, 431 (6th Cir. 2013); and

4. Orders the parties, within 30 days, to confer and file a proposed litigation schedule for this Court's consideration.

Benjamin Beaton, District Judge
United States District Court

August 12, 2023